```
 1          IN THE UNITED STATES DISTRICT COURT
 2           FOR THE SOUTHERN DISTRICT OF IOWA
 3                    EASTERN DIVISION
 4    BRADLEY A. ANDERSON,           }
                                     }
 5         Plaintiff,                }
                                     }
 6    vs.                           } CASE NO.:
                                    ) 3:22-CV-12
 7    BNSF RAILWAY COMPANY, a        )
      Delaware corporation,          )
 8                                   }
           Defendant.                )
 9                                   )
                                     )
10
11
12          THE VIDEOTAPED AND ZOOM DEPOSITION of
13    SHANTA MATTAI, M.D., called for examination
14    pursuant to the provisions of the Federal Rules
15    of Civil Procedure, as they apply to the taking
16    of depositions, taken before Kathy L. Johnson,
17    C.S.R., a Notary Public in and for the County of
18    Henry, State of Illinois, on February 9th, 2023,
19    at the hour of 10:14 a.m., at Illinois
20    Neurological Institute, 200 E. Pennsylvania
21    Avenue, Peoria, IL, 61603.
22
23
24    Job No. CS5687740
```

Page 2

1          I N D E X
2
3  WITNESS:  SHANTA MATTAI, M.D.
4
5  EXAMINATION BY:              PAGE:
6  MR. HEDRICK              4
7  MR. FULLER              46
8  MR. HEDRICK              56
9  MR. FULLER              58
10  MR. HEDRICK              59
11
12          E X H I B I T S
13
    Exhibit No. 1              4
14
    Exhibit No. 2              4
15
    Exhibit No. 3              4
16
    Exhibit No. 4              4
17
    (Attached)
18
19
20  SIGNATURE WAIVED BY THE WITNESS
21
22  CERTIFICATE OF REPORTER              62
23
24

Page 3

1          A P P E A R A N C E S
2
3  HUNEGS LeNEAVE & KVAS, P.A.
    BY:  MR. THOMAS FULLER
4  1000 Twelve Oaks Center Drive
    Suite 101
5  Minneapolis, MN 55391
    612-339-4511
6  tfuller@hlklaw.com
    Appeared via Zoom on behalf
7  of the Plaintiff;
8
    KNIGHT NICASTRO MACKAY, LLC
9  BY:  MR. MITCHELL P. HEDRICK
    211 Fulton Street
10  Peoria, IL 61602
    309-296-0121
11  hedrick@knightnicastro.com
    Appeared via Zoom on behalf
12  of the Defendant.
13
14  ALSO PRESENT VIA ZOOM:
15  MS. ISABEL JOHNSON
16  MR. PAT CURTO, Videographer
17
18
19
20
21
22
23
24

Page 4

1          (Exhibits Nos. 1-4 marked for
2          identification)
3          (Deposition start time:  10:14 a.m.)
4          THE VIDEOGRAPHER:  All right.  This is
5  the zoom video deposition of Shanta Mattai, M.D.
6  Today's date is February 9th, 2023, and the time
7  is 10:14 a.m.
8          Doctor, you may remain seated and the
9  court reporter will swear you in.
10          (Witness sworn)
11          SHANTA MATTAI, M.D.,
12  being first duly sworn on oath, was examined and
13  testified as follows:
14          EXAMINATION BY
15  MR. HEDRICK:
16  Q.  Good morning, Doctor.
17  A.  Good morning.
18  Q.  Can you state your name for the record,
19  please?
20  A.  Shanta Mattai.
21  Q.  Doctor, you've been asked to testify here
22  today because you were identified as a witness in
23  a lawsuit filed by Mr. Bradley Anderson against
24  BNSF Railway, and more specifically because you

Page 5

1  and two of your colleagues here at INI provided
2  treatment to Mr. Anderson.  My name is Mitch
3  Hedrick.  I represent BNSF Railway and I'll be
4  asking you some questions today.
5  A.  Okay.
6  Q.  On the zoom link is Mr. Thomas Fuller.
7  He represents Mr. Anderson, and he may have some
8  questions for you today as well.  Okay?
9  A.  Okay.
10  Q.  Have you ever testified at a deposition
11  or a trial before?
12  A.  Yes.
13  Q.  And what were the circumstances of that
14  testimony or those cases?
15  A.  Why do you ask?
16  Q.  Well, the reason we ask is that we need
17  to determine first, you know, whether or not that
18  may be in any way similar to this case, but then
19  also to -- because there are certain rules for
20  testimony that I want to discuss with you based on
21  your experience level with lawsuits.
22  A.  Most recent was a car accident and then
23  a death in the hospital.
24  Q.  Okay.  So the car accident matter, did

2 (Pages 2 - 5)

Page 6

1  that involve a traumatic brain injury?
2      A. No.
3      Q. And the death in the hospital incident,
4  did that involve a traumatic brain injury?
5      A. No.
6      Q. Okay. Did the car accident matter
7  involve anything related to treatment for a closed
8  head injury of any kind?
9      A. No.
10     Q. And the same question for the hospital
11 death matter, did that involve a closed head
12 injury of any kind?
13     A. No.
14     Q. All right. So since you've testified
15 before I think you probably know the rules of the
16 deposition or how depositions go, but just to --
17 for a brief --
18     A. Yes, please.
19     Q. -- for a brief recap, you're under oath
20 so you have to tell the truth. That's pretty
21 obvious. It's important that only one person
22 speaks at a time, so I'll wait until you finish
23 your answer before I ask any question.
24         And I also ask that you ask -- or that

Page 7

1  you wait -- until I finish my question to provide
2  your answer. Fair?
3      A. Yes.
4      Q. Okay. It's also very important that we
5  answer questions verbally because as you can
6  see --
7      A. Yes.
8      Q. -- the court reporter is taking down what
9  we say and she cannot --
10     A. Yes, a head nod. She cannot take down a
11 head nod, yes.
12     Q. Exactly. So shoulder shrugs and --
13     A. Yeah.
14     Q. -- hand gestures are common in normal
15 conversation, but at least for today let's try to
16 make sure that we answer verbally. Okay?
17     A. Yes.
18     Q. If a question's unclear or you didn't
19 hear it because of zoom link or because of some
20 goofiness in the way that we've asked the question
21 please say so and we'll rephrase it or restate it
22 in a way that's a bit more clear and so that you
23 can hear it. Okay?
24     A. Yes.

Page 8

1      Q. If you do answer we'll presume that you
2  understood the question and that what you've
3  provided us is your best, most honest and most
4  accurate answer. Is that fair?
5      A. Yes.
6      Q. And if you hear objections please wait
7  for us and then we'll tell you whether you should
8  answer the question or not.
9      A. Okay.
10     Q. Obviously there's no judge here today so
11 we have to kind of -- it's not a game, but kind of
12 like pickup basketball -- we call our own fouls
13 during depositions. So we'll tell you yes you can
14 answer or please do not answer. Okay?
15     A. Okay.
16     Q. If you'd like a break let us know and
17 we'll take one. I don't think we're going to be
18 here long enough to take breaks, but if you do
19 need one, as long as there's no question pending,
20 we can do that. Okay?
21     A. Okay. Sounds good.
22     Q. All right. So I've marked as Exhibit One
23 the Defendant's second amended notice of taking
24 deposition of Dr. Shanta Mattai issued January

Page 9

1  29th, 2023. And as Exhibit Number Two the
2  subpoena to testify at a deposition in a civil
3  action issued on January 19th, 2023 to you, Dr.
4  Mattai.
5      A. Uh-huh.
6      Q. That subpoena requests certain documents,
7  including your CV.
8      A. Uh-huh.
9      Q. And you've been gracious enough to
10 provide us with a copy of your CV. Is this the
11 most recent version of your CV?
12     A. Yes.
13     Q. And is there anything that you have in
14 the works in terms of publications, speaking
15 engagements, that are coming up but haven't been
16 listed on here?
17     A. No.
18     Q. All right. And are there any other
19 honors, awards, research or teaching experience
20 that you have coming up that aren't on here?
21     A. No.
22     Q. All right. So we've marked as Exhibit
23 Number Three your CV. Have you brought with you
24 any other materials for consideration in today's

3 (Pages 6 - 9)

1  deposition?
2      A.  Well, I've got my computer and the
3  patient's chart is up, so that's all I have.
4      Q.  Okay.  So when you say the patient's
5  chart, is that the digital records that are
6  available to you as the doctor here at Illinois
7  Neurological Institute?
8      A.  Yes.
9      Q.  And I will represent to you that earlier
10 in this case we issued a subpoena to Illinois
11 Neurological Institute for records related to the
12 treatment of Bradley Anderson.  For the record, we
13 have marked those as Mattai -- Exhibit Mattai
14 Four.
15          And also for the record they are Bates
16 stamped BNSF underscore Anderson 003298 through
17 BNSF underscore Anderson 003358.
18          So, Doctor, I asked you this question
19 when you came in today, but is there -- to your
20 knowledge -- is there anything in the digital
21 records that you have available to you on your
22 laptop that would not be included in physical
23 records that may have been provided -- or that
24 were provided to us -- in this case?

1      A.  There should not be.
2      Q.  Okay.  So to the best -- just to the best
3  of your --
4      A.  To the best of my knowledge they should
5  not be.
6      Q.  Okay.  I understand, and I appreciate
7  that.  Thank you.  Have you reviewed any records
8  in preparation for today's deposition?
9      A.  I reviewed his chart.
10     Q.  Okay.  And have you discussed Mr.
11 Anderson's treatment with any of your colleagues
12 in preparation for today's deposition?
13     A.  No.
14     Q.  Have you discussed Mr. Anderson's
15 treatment or anything related to your testimony
16 with Mr. Anderson?
17     A.  No.
18     Q.  Have you discussed with Mr. Anderson's
19 counsel any treatment or your testimony in today's
20 case?
21     A.  No.
22     Q.  Have you and I discussed anything other
23 than the brief introductory conversation we had
24 before we went on the record today?

1      A.  No.
2      Q.  Okay.  Is there anything else that you've
3  done to prepare for today's deposition that I
4  haven't --
5      A.  No.
6      Q.  -- asked about?  All right.  And can you
7  provide us with a brief overview of your
8  education, work experience and your subspecialty
9  or specialty in the medical field?
10     A.  I'm sorry, my computer just froze on me.
11 It locked me out so I didn't hear that.  Can you
12 say that again, please?
13     Q.  Sure.  Can you provide us with a brief
14 rundown of your education, work experience, and
15 then subspecialty or specialty in the medical
16 field?
17     A.  I did my medical school at Northwestern
18 University and then I did my residency at
19 University of Wisconsin.  I practiced there for a
20 year and then I came to Peoria where I am a
21 general neurologist.  We also have an appointment
22 with University of Illinois.
23     Q.  Okay.  And it looks like --
24     A.  And I'm Board certified.

1      Q.  Yep.  That was going to be my next
2  question.  Are you Board certified in any
3  particular specialty or subspecialty of the
4  medical field?
5      A.  No.
6      Q.  And you have medical -- it looks like
7  you've got medical licenses -- in Wisconsin and
8  Illinois --
9      A.  In Illinois.
10     Q.  -- correct?
11     A.  Yes.
12     Q.  Any other states?
13     A.  No.
14     Q.  Do you have credentials for any hospitals
15 here in Peoria or anywhere else?
16     A.  Other than OSF.
17     Q.  So OSF-St. Francis?
18     A.  St. Francis, yes.
19     Q.  Got you.  Any other OSF-affiliated
20 hospitals or is that the only one?
21     A.  I think you get certified -- you get
22 approved for all of OSF, hospitals, clinics, if
23 you get -- maybe not.  I don't know.
24     Q.  All right.  So I think I understand what

1 you're saying correctly. But just for the record
2 and for my own edification, OSF Medical Group has
3 a number of hospitals other than OSF-St. Francis,
4 right?
5      A. Yes.
6      Q. And so when you say you're credentialed
7 by OSF, to the best of your knowledge does that
8 mean that you're credentialed then to work in and
9 treat patients in any of their -- any of OSF's
10 hospitals?
11      A. I thought so.
12      Q. Okay.
13      A. I haven't had to think about it for
14 awhile but I -- it might not be. It may just be
15 for the -- in Peoria.
16      Q. I see. All right. So you've worked for
17 OSF Medical Group since 2005 according to your CV.
18 Is that all with OSF Medical Group? I know there
19 was a merger between INI and OSF. How did that --
20 where were you before the merger?
21      A. So I was employed by the OSF Hospital,
22 the Medical Group, before they became INI.
23      Q. Okay. And --
24      A. So if they -- we were undergoing the

1 process of becoming the INI -- probably a couple
2 years after I started, I think. Yeah.
3      Q. Got you. So when the --
4      A. So it's all the same base -- I mean, it
5 is the same.
6      Q. All right. So Illinois Neurological
7 Institute, INI, was acquired by OSF at some point
8 I think in the late 2010's give or take. Is that
9 -- is that -- am I correct in saying that?
10      A. I've never thought that we were not part
11 of OSF.
12      Q. Oh.
13      A. That we were -- that OSF has always been
14 above us.
15      Q. Ah.
16      A. But we are a -- we're just a separate
17 entity but still over -- over -- OSF is over us.
18 That's been my understanding.
19      Q. Okay.
20      A. I still get paid by the same -- it still
21 says OSF on it. It's never changed to INI.
22      Q. I understand.
23      A. So that's my understanding of it.
24      Q. I appreciate you helping to clarify that

1 for me because I think I may have been mistaken.
2      A. Okay.
3      Q. I think that was arranged.
4      A. Yes.
5      Q. Did you do a Fellowship? Are you
6 Fellowship trained or residency trained?
7      A. No, I did not do a Fellowship, I'm a
8 general neurologist.
9      Q. Okay. When you did your residency was
10 there a particular focus in your residency on
11 neurology?
12      A. That was my residency --
13      Q. Okay.
14      A. -- neurology.
15      Q. All right. And you've been an attending
16 physician in the Department of Neurology for OSF
17 Medical Group since 2005; is that right?
18      A. Yes. Yes.
19      Q. All right. So in terms of treatment of
20 patients who report to you with potential closed
21 head injuries what generally is your process for
22 diagnosis and treatment of such patients?
23      A. I rarely see patients with closed head
24 injuries.

1      Q. Okay. And so --
2      A. We have a concussion clinic that they
3 would go to, and as a result I rarely see them.
4      Q. Okay. So when, generally speaking, when
5 is it that your -- I guess when is it that you're
6 pulled into that particular area of the practice
7 as opposed to your normal practice?
8      A. I don't have too much of a choice in what
9 I see.
10      Q. Understand.
11      A. So like others, for instance, we used to
12 have a stroke clinic. We don't anymore. And so
13 when the patients would need to be seen through
14 the referral system they would just get funneled
15 -- all the strokes would get funneled -- to the
16 stroke clinic.
17      Q. I see.
18      A. So similarly, there is an Attending, or
19 there may be a couple of Attendings, who do a lot
20 of closed head injury work as a neurologist. And
21 so the concussion clinic or this other
22 neurologist, that's where most of the patients
23 go --
24      Q. Okay.

5 (Pages 14 - 17)

Page 18

1    A. -- so...
2    Q. And for the record, who is that
3  neurologist or those neurologists that ordinarily
4  do the concussion clinic for INI?
5    A. So Dr. Jankowska is a neurologist and she
6  does a lot of the closed head injuries.
7    Q. Okay.
8    A. And then the concussion clinic, I think
9  that those are neurosurgeons. I don't know that
10  there's necessarily a neurologist that works in
11  that clinic. I think that's run by neurosurgery.
12    Q. Okay. And Dr. Jankowska's name is
13  briefly mentioned in some of the records but it
14  appears he did not -- I'm sorry, she did not --
15  treat Mr. Anderson. How is it that the division
16  of work in INI falls to you for Mr. Anderson
17  rather than Dr. Jankowska?
18    A. So I think that there was some -- there
19  was something a little bit out of -- out of sorts
20  with the patient's dizziness --
21    Q. Okay.
22    A. -- so the concussion clinic sent the
23  patient to see me from the neurologic perspective
24  of that.

Page 19

1    Q. Okay. Good. And so -- and we'll get
2  into the specifics of his care in just a moment.
3  But just for the record, what is your -- I guess
4  for lack of a better term -- your normal area of
5  practice at INI as opposed to the closed head
6  injuries or concussion?
7    A. So I do headaches, back pain, seizures,
8  strokes, memory problems, neuropathies, that's
9  what I tend to do. Parkinson's, Alzheimer's.
10  Those sorts of things.
11    Q. All right. And it sounds like you, at
12  least to the best of your recollection, there was
13  something about Mr. Anderson's presentation that
14  someone at the concussion clinic thought this
15  would be something you should -- you should look
16  at; is that correct?
17    A. Yes.
18    Q. Okay. There are different levels of care
19  in INI's practice, correct, in terms of physician
20  assistants versus physicians?
21    A. Uh-huh.
22    Q. How does the division of work between
23  PA's and physicians work in the concussion clinic,
24  or just at INI generally?

Page 20

1    A. I don't know.
2    Q. Okay. Do you know how it's determined
3  that a patient can be seen or treated by a PA as
4  opposed to a physician?
5    A. I don't know that.
6    Q. Okay. So as a physician do you review
7  and rely on medical records of physician's
8  assistants in your practice to diagnose or assess
9  certain patients?
10    A. When I'm assessing them I take that into
11  consideration.
12    Q. Okay. So --
13    A. I mean, anything that's part of the
14  medical record related to whatever the person is
15  being seen for then I try to review that.
16    Q. I see. So just from a -- from the
17  standpoint of trying to figure out how it is that
18  you go about doing your job -- the chart that you
19  have, is that -- does that include the PA's
20  records in addition to your own?
21    A. Yes.
22    Q. All right.
23    A. And for whatever reason I'm actually not
24  able to access it anymore.

Page 21

1    Q. Interesting.
2    A. I can use the paper but I don't even
3  understand why I can't --
4    Q. So when you say you can't access it, were
5  you able to access it this morning and you're just
6  having difficulty now?
7    A. Yeah. So I was -- I was on it --
8    Q. Okay.
9    A. -- and then it said it couldn't connect
10  to the server, so I'm still not connected to the
11  server.
12    Q. Okay. So it sounds like maybe just a
13  technical difficulty. Hopefully you can get back
14  on but we do have --
15    A. Yes.
16    Q. -- physical records.
17    A. Yes.
18    Q. Paper records.
19    A. So I might have to do that. I'm not the
20  best computer person. I'll try again.
21    Q. I understand.
22    A. Okay.
23    Q. All right. So as you sit here today do
24  you recall treating a gentleman named Bradley

6 (Pages 18 - 21)

Page 22

1 Anderson?

2    A. Yes.

3       Q. And as you sit here having, you know,

4 looked through a little bit of the chart and

5 having now talked a little bit about his treatment

6 what is it that you recall specifically about Mr.

7 Anderson's treatment?

8       A. I'm going to have to look at these --

9    Q. Sure.

10    A. -- because I'm not going to be able to

11 get back on it I don't think.

12    Q. So I'm handing you what's been -- or been

13 marked as Exhibit Mattai Four. These are the

14 medical records that we received via subpoena in

15 this case.

16    A. Is someone able to come and help me?

17       MR. HEDRICK: Yeah. Thomas, can -- do

18 you mind if we take a short break to see if we can

19 get someone in the office to help Dr. Mattai get

20 her chart working on her computer?

21       MR. FULLER: Not at all.

22       THE WITNESS: Okay, thank you.

23       MR. HEDRICK: Okay. We'll go off the

24 record shortly and hopefully we can get this

Page 23

1 working.

2       THE VIDEOGRAPHER: We're going off the

3 record at 10:32 a.m.

4       (Break taken at this time)

5       THE VIDEOGRAPHER: We are back on the

6 record at 10:41 a.m. Go ahead.

7 BY MR. HEDRICH:

8    Q. So, Doctor, before we went off the record

9 we briefly discussed the nature of your -- or your

10 recollections of treatment of Bradley Anderson --

11 and his treatment at Illinois Neurological

12 Institute.

13       So I've got some more specific

14 questions about his care here for you that I'd

15 like to ask here going forward.

16    A. Okay.

17    Q. When was the first time that Mr. Anderson

18 was seen at INI?

19    A. Let me see here. So it was 5/2 of 2019.

20    Q. And what was he -- what was the reason

21 for his presentation on 5/2/2019?

22    A. The chief complaint written was neck

23 pain.

24    Q. Who was the provider here at INI that saw

Page 24

1 him on that date?

2    A. Jacinda Cornick.

3    Q. And are you familiar with Miss Cornick?

4    A. No.

5    Q. It looks like she is a PAC. Do you know

6 what that stands for?

7    A. She's a physician's assistant.

8    Q. All right.

9    A. I don't know what the C is for.

10    Q. Got you. And to the best of your

11 knowledge was Miss Cornick a physician's assistant

12 in the concussion clinic here or somewhere --

13 anywhere else? You mentioned the concussion

14 clinic before, that's why I ask.

15    A. Yeah, I believe she's --

16       THE VIDEOGRAPHER: Excuse me, Doctor.

17 You're off camera right now. Could you --

18       THE WITNESS: Yeah, sorry. So I

19 believe she is within the concussion clinic, yes.

20 BY MR. HEDRICK:

21    Q. Okay. And I know that you didn't see the

22 patient on that day but you mentioned earlier that

23 you rely on or at least consider the observations

24 of PA's in determining -- determining care or

Page 25

1 determining an assessment -- of the Plaintiff --

2 of the patient's condition. What is it that Miss

3 Cornick noted in his history and present illness?

4    A. Do I have to -- I -- it's in here for you

5 to read it.

6    Q. All right. So is there anything in the

7 -- in this particular note or in this particular

8 history -- that you would disagree with or have

9 reason to disagree with based on your reading of

10 it?

11    A. Whether I disagree or not it's not -- I

12 can't -- I'm not going to answer that.

13    Q. All right. What is it that Miss Cornick

14 -- what assessment or diagnosis -- did Miss

15 Cornick give Mr. Anderson on that day?

16    A. I really cannot tell you what other

17 people said. Okay. Do I have to answer that?

18    Q. Well, based on -- based on your review of

19 the record --

20    A. Because you can review the records too.

21 It's right here what she says. I'm not going to

22 say what other people said. I'm really just going

23 to talk about what I know of. Right? I just

24 don't -- I mean, that's not my -- I'm not going to

Page 26

1  do that.
2      Q.  I understand.  I'm not trying to harass
3  you into saying anything --
4      A.  Because it's right here.  You can read it
5  for yourself what she said.
6      Q.  I know.
7      A.  I can -- I can read the chart --
8      Q.  I'm just asking you to confirm on the
9  record that that's -- that's what she said.
10     A.  I cannot speak to what anyone wrote, and
11  I won't do that.
12     Q.  Okay.
13     A.  Because what they write is what they
14  write in the medical record, which is legal.  You
15  know, it's a legal document as well.  So whatever
16  they put in there, that's what they think.  I'm
17  not going to say about this.  It's just like
18  reading it back to you basically.
19     Q.  I understand.  So I have some other
20  follow-up questions about the other -- the other
21  visits -- that Mr. Anderson had with Miss Cornick.
22  When was the next time that Miss Cornick saw Mr.
23  Anderson?
24     A.  So it looks -- so another visit was July

Page 27

1  29th, 2019.  Sorry.
2      Q.  All right.  I'm showing that his next
3  visit --
4      A.  Oh, was it the 30th?  Sorry.
5      Q.  -- was May 16th of 2019.
6      A.  Oh.
7      Q.  Is that a date that you've got in the
8  chart as well?
9      A.  Yes.
10     Q.  Okay.  And so I know that you're not
11  going to comment or, you know, restate what Miss
12  Cornick has already stated in her records.  Is
13  there anything that as you sit here today you
14  disagree with in those records?  I'm not asking
15  you to criticize.
16         MR. FULLER:  I've got to object to the
17  form of the question, counsel.  The doctor's
18  already testified that she's not comfortable
19  regurgitating records from other providers.  I
20  don't think you're being fair to this witness.
21         She's here to testify about her care
22  and treatment.  So I believe these are unfair
23  questions.  She lacks foundation and has already
24  explained reasons why she doesn't want to get into

Page 28

1  the other care and treatment of other providers.
2  BY MR. HEDRICK:
3      Q.  Okay.  So I guess maybe the better way to
4  ask this, is this a -- is this a document or a
5  record that you would ordinarily rely on in your
6  treatment of a patient that has been referred to
7  you from the concussion clinic?
8         MR. FULLER:  Form.  I just objected to
9  the form of the question again.  Go ahead, Doctor.
10        THE WITNESS:  So repeat the question
11  again.
12  BY MR. HEDRICK:
13     Q.  So the records from Miss Cornick, are
14  those records that you would ordinarily review and
15  rely on in determining the -- what care or what --
16  what diagnosis has been provided to a patient such
17  as Mr. Anderson?
18     A.  I review the information.  Do I rely on
19  it?  No.
20     Q.  Okay.
21     A.  I rely on my own information that I
22  gather.  That's what I rely on.
23     Q.  Okay.  All right.  I don't mean to say
24  that you should or shouldn't rely on it.  I'm just

Page 29

1  asking to make sure that I understand when we get
2  to your actual treatment of Mr. Anderson what it
3  is that you reviewed or relied on and what
4  information is important to you when you make your
5  assessment.  Okay?
6         All right.  So it looks like Miss
7  Cornick had -- or I'm sorry -- Mr. Anderson met
8  with Miss Cornick on four other occasions before
9  she -- before he was referred to you.
10        To the best of your knowledge do you
11  recall anything about those records or about that
12  treatment that you would have reviewed or relied
13  upon prior to him coming to you?
14     A.  I review the records.
15     Q.  Okay.  And it looks like there's a
16  treatment -- or there's a treatment date -- on
17  September 5, 2019 with a person named Cynthia
18  Guede, G-u-e-d-e.  Are you familiar with Mrs.
19  Guede?
20     A.  Yes.
21     Q.  And what capacity does Mrs. Guede work at
22  here at INI?
23     A.  She is retired now.
24     Q.  Okay.  And when she -- before she

8 (Pages 26 - 29)

Page 30

1 retired?
2     A. She was an audiologist in the vertigo
3 clinic.
4     Q. All right. The same question as to the
5 records of Miss Cornick. Is this a record from
6 9/5/19 with Miss Guede that you would have
7 reviewed in preparation for your assessment and
8 treatment of Mr. Anderson?
9     A. Yes.
10    Q. Okay. So when was the first time that
11 you saw Mr. Anderson?
12    A. So let's see here. So that was January
13 13th of 2020.
14    Q. Okay. And what was his chief complaint
15 to you at that time?
16    A. Episodes of whooziness.
17    Q. All right. And is there any indication
18 in your records as to the onset of those symptoms?
19    A. So they went -- so I put down March 22nd
20 of 2019.
21    Q. Okay. And is this -- is that information
22 -- that was provided to you by Mr. Anderson or by
23 -- was that information that you gathered from
24 review of prior records or -- if you recall?

Page 31

1     A. I don't recall.
2     Q. Do you recall speaking with Mr. Anderson
3 on that date about the onset of his symptoms?
4     A. Do I recall in my head the encounter I
5 had with him or what I wrote in the chart?
6     Q. Well, let's start with do you recall in
7 your head anything about the encounter with him?
8     A. No.
9     Q. And then according to your records did
10 Mr. Anderson provide a statement to you or make
11 any statements to you about the onset of his
12 symptoms?
13    A. I expect he would have, yes.
14    Q. Okay. And is that part of a subjective
15 examination or interview or clinical interview
16 with the patient that you would do as a normal
17 part of your practice?
18    A. It is.
19    Q. According to your records what is it that
20 Mr. Anderson reported to you?
21    A. Reported to me about what?
22    Q. About the onset of his symptoms. The --
23 any prior treatment. Any issues that he's have --
24 that he's having at that time.

Page 32

1     A. Things that he reported are headache,
2 feeling foggy, tired, irritable, vertiginous,
3 memory problems, feeling overwhelmed, problems
4 sleeping.
5     Q. Okay. Did he indicate to you that he was
6 working or not working at that time?
7     A. I believe he was working at the time.
8     Q. Okay.
9     A. I cannot be -- I'm going by what my
10 notes -- so if I specifically say it then it makes
11 it easy.
12    Q. Sure.
13    A. If it's not there I don't know.
14    Q. Okay. So basically, if I understand you
15 correctly, and I don't want to put words in your
16 mouth and I don't want to mischaracterize anything
17 about your treatment here of him, if it's in the
18 record then that's what you believe is correct; is
19 that fair?
20    A. Yes.
21    Q. Okay. Okay. So what was your assessment
22 then according to your records of Mr. Anderson at
23 that time?
24    A. That his -- that his symptoms were

Page 33

1 gradually getting better from his injury that he
2 had.
3     Q. Okay. And so what was your recommended
4 course of treatment for Mr. Anderson at that time?
5     A. I wanted to get an MRI scan of his head.
6     Q. Okay.
7     A. And he was going to take some Extra
8 Strength Tylenol for his headache and Naprosyn as
9 well. And I was glad that things seemed to be
10 getting a little bit better. And then I wanted
11 Dr. Jankowska to see him because she deals a lot
12 with traumatic brain injuries --
13    Q. Okay.
14    A. -- and concussions.
15    Q. And at that time did you make a referral
16 for Mr. Anderson to see Dr. Jankowska?
17    A. I did.
18    Q. To your knowledge did Mr. Anderson then
19 see Dr. Jankowska afterwards?
20    A. To my knowledge he did not.
21    Q. Okay. Do you have any reason -- or do
22 you have any recollection -- as to why he didn't
23 go see Dr. Jankowska --
24    A. No.

Page 34

1   Q. -- one way or the other?
2   A. No.
3   Q. When is the next time that you saw Mr.
4 Anderson?
5   A. So I had a televideo visit on April 21st
6 of 2020.
7   Q. And is this a follow-up to your prior
8 visit in January 2020, or was this something
9 different or new?
10   A. No, this was a follow-up from his
11 previous.
12   Q. Okay. And according to your records what
13 is it that he reported to you and what sort of
14 recommendations did you make for his -- for his
15 care -- at that time?
16   A. His headaches and his memory seemed to
17 have improved. He was continuing to have his
18 vertigo and I wanted to have him go back to
19 physical therapy, and then he could come back to
20 see me if he wasn't going to see Dr. Jankowska.
21   Q. Okay. At the time of his telehealth
22 visit in April of 2020 did he indicate to you why
23 he did or did not want to see Dr. Jankowska?
24   A. No.

Page 35

1   Q. Okay. Based on your recommendations do
2 you know whether or not he had physical therapy to
3 address the symptoms that he was -- that he was
4 having?
5   A. I believe so.
6   Q. And was that with INI or was that with a
7 different provider, if you know?
8   A. Well, I referred him to physical therapy
9 at St. Mary's Hospital in Galesburg.
10   Q. Okay. And do you have access to records
11 of his physical therapy or is that something that
12 that entity would have?
13   A. They would have that.
14   Q. Okay.
15   A. And that we should have that someplace.
16   Like a sharing of records between the
17 different divisions of OSF that is available to
18 you or?
19   A. They try to.
20   Q. Okay.
21   A. And here, so he was seen -- let's see.
22 So they gave some recommendations and exercises
23 for him to do. And let's see here. Let me see.
24 And they wanted to have him, you know, follow up

Page 36

1 with them.
2   Q. With OSF-St. Mary's?
3   A. Yeah.
4   Q. Okay.
5   A. Again.
6   Q. All right. So after 4/21 of 2020 did you
7 see Mr. Anderson again?
8   A. No.
9   Q. Okay. It looks like there are some
10 records of care by Miss Cornick and Miss Guede
11 that follow your April 21st, 2020 telehealth visit
12 with Mr. Anderson. Do you recall -- have you
13 reviewed those records -- or is that something
14 that you would review in the normal course of your
15 care of a patient like Mr. Anderson?
16   A. So not necessarily. If I haven't -- if I
17 -- if my last visit was in April then those
18 records wouldn't come to me.
19   Q. Okay. So do you discharge him from your
20 care and send him to someone else or is this just
21 a situation where he continued to see the PA's --
22   A. He went back to see them, yes.
23   Q. -- and you were not involved?
24   A. So he went back to see the PA, and I

Page 37

1 think she wanted him to see Dr. Jankowska as well.
2   Q. Okay.
3   A. But then I didn't -- there wasn't
4 anything alarming to me so -- to address the
5 reason why he was sent to me in the first place,
6 so then he could go back again to see his PA.
7   A. Okay.
8   Q. I don't know -- I mean, I ordered an MRI
9 scan. I don't know that they -- they don't
10 normally order those -- so it may have been that
11 they were concerned about perhaps something
12 different or worse damage that could have been
13 done, and so then I ordered the MRI scan.
14   Q. You mentioned that you didn't see
15 anything alarming. Can you explain what you mean
16 when you say you didn't see anything alarming?
17   A. I thought that his -- his -- his course
18 was in the realm of what one might expect for
19 someone who has the injury that he has.
20   Q. And so for --
21   A. He didn't have a stroke. I mean, I did
22 the MRI scan, so he didn't have anything major
23 that we would be concerned about otherwise.
24   Q. Okay. And so for people who are not as

1 familiar with neurological symptoms as you are,
2 when you say the normal course for injuries of
3 that nature what is it that you mean?
4    A.  So over time with treatment that things
5 get better.
6    Q.  And based on your review and assessment
7 of Mr. Anderson is that your opinion then that he
8 was getting better?
9        MR. FULLER:  Foundation.
10        THE WITNESS:  Things were improving
11 for him.
12 BY MR. HEDRICK:
13    Q.  Okay.  All right.  So after you saw Mr.
14 Anderson in April of 2020 do you know if he went
15 to see Dr. Jankowska?
16    A.  No, he did not.
17    Q.  Okay.  And it appears that he was
18 discharged from INI as a patient on July 16th of
19 2020 by Dr. -- by Cynthia Guede?
20    A.  Okay.
21    Q.  I'm not asking you to comment one way or
22 the other, but is that -- to your knowledge -- is
23 that the last time that he was seen here at INI?
24    A.  What date was that again?  Sorry.

1    Q.  July 16th, 2020.
2    A.  Well, July 16th was the last telemedicine
3 appointment.
4    Q.  Okay.
5    A.  So I would say -- and then 7/16/20 there
6 was a telephone call.  But I don't think -- let me
7 just get this note up again here from Cynthia.
8    Q.  Okay.
9    A.  Let's see here.  Okay.  Let me just see.
10 I see.  So she didn't discharge him from the
11 clinic.
12    Q.  Okay.
13    A.  That's a completely different thing.  She
14 said if it comes back again then they need to --
15 that he needs to follow up.
16    Q.  All right.  So if I'm reading this
17 correctly then, Cynthia Guede provides an
18 assessment based on her review and discussions
19 with Mr. Anderson as to the -- as to the symptoms
20 he's continuing to experience, if any.
21        And then her recommendation is to --
22 is to return if needed -- basically.  Is that
23 true?
24    A.  Right.  If he gets -- if it comes -- if

1 it comes back again then he should, you know, he
2 can call at that time.
3    Q.  Okay.  So at least according to Miss
4 Guede it says that he was -- he's no longer
5 experiencing spinning, that he was previously
6 getting really nauseated but that part is gone.
7 Still feels off on occasion but he has days where
8 he feels completely normal.
9        And then he goes through his --
10 basically all of the symptoms that he's
11 experiencing -- or lack thereof in some cases.
12        And so based on that information is it
13 correct then that doctor -- or Miss Guede --
14 relied on that information to then say okay, you
15 don't need to come in anymore, let us know, or
16 call us if something comes back up?  Is that
17 accurate?
18        MR. FULLER:  Form.
19        THE WITNESS:  At that particular
20 time --
21        MR. FULLER:  Form.  I objected to the
22 form.  But go ahead, Doctor.
23        THE WITNESS:  At the time symptoms
24 seemed to be better, so if they got worse again

1 then, which they could, then he would call the
2 clinic.  Because, you know, he has to come all the
3 way to Peoria --
4 BY MR. HEDRICK:
5    Q.  Right.
6    A.  -- you know.
7    Q.  Yep.  Yep.  Because he lives out in the
8 Galesburg area.
9    A.  He just can't keep coming back constantly
10 because he lives in Gales -- you know, he lives
11 outside of Peoria.
12    Q.  Okay.  And after that time to your
13 knowledge or based on the records that are in the
14 chart has Mr. Anderson returned to INI complaining
15 of any of the symptoms that he previously --
16 previously had?
17    A.  It doesn't seem like he has made any
18 calls.  We don't have record of any calls after
19 7/16/20.
20    Q.  Okay.  All right.  And as to the nature
21 of Mr. Anderson's injury do you know what his job
22 duties were at the railroad?
23    A.  No.
24    Q.  Do you know what his job duties were on

Page 42

1  the date that he alleges that he sustained an
2  injury?
3       A. I can look back at my notes and see if I
4  put it in there, but if it's not in there then I
5  don't know.
6       Q. Okay. So let's just -- I guess I have
7  written down that he was a driver. I'm not quite
8  sure. Conductor on a train. That's all I have.
9       Q. Okay. And so at least to the best of
10  your knowledge and based on your review of your
11  records from treatment of Mr. Anderson do you know
12  what job tasks or duties he was performing at the
13  time that he says that he was injured?
14       A. No, other than what I previously said.
15       Q. All right. And so because of that,
16  because you don't know what he was doing at the
17  time of his injury or what his job entailed do you
18  have any opinions as to whether or not the
19  incident that he complains of caused his
20  condition?
21            MR. FULLER: Form.
22  BY MR. HEDRICK:
23       Q. The condition for which you saw him?
24       A. Yes.

Page 43

1       Q. All right. And -- all right. So if you
2  don't under -- or if you don't know what his job
3  duties were and how it is that he says that he --
4  says he was injured -- what basis then do you have
5  to say one way or the other that the incident
6  caused his condition that you -- that you
7  observed?
8       A. Because he fell again, I know that.
9       Q. Okay. And --
10       A. I don't need to -- I mean, I might have
11  known at the time too and I didn't write it in my
12  notes, which is probably what happened.
13       Q. Okay.
14       A. Because I don't write everything -- you
15  can't write everything in the note. But yeah,
16  it's fine. He fell, he had this injury, he went
17  to the emergency room, he required stitches. So I
18  think it's pretty clear.
19       Q. All right. And I think I know the answer
20  to this but I have to ask it for the record. Were
21  you present with him at the time that he says that
22  he was injured?
23       A. No.
24       Q. All right.

Page 44

1       A. I mean, in his job?
2       Q. Right.
3       A. No.
4       Q. So is it accurate to say that you don't
5  have personal knowledge of the incident and how
6  that incident took place?
7       A. I don't even know what that sentence --
8  what that question is.
9       Q. All right. So do you have personal
10  knowledge based on something that you observed,
11  saw, heard or experienced, that gives you a basis
12  to say this is what happened to him?
13       A. No.
14       Q. Okay. And so you're then relying on Mr.
15  Anderson's statements to you about how this
16  incident happened or what happened to him to form
17  an opinion based on -- based on his statements --
18  of whether or not this incident caused his
19  condition that you treated?
20       A. There was nothing out of the ordinary to
21  make me believe otherwise. To believe -- we hear
22  what our patients have to say -- and we put it --
23  you know, we write it down. And I don't -- had no
24  reason to believe otherwise.

Page 45

1       Q. Okay. So --
2       A. And it didn't make a difference to me.
3       Q. So regardless of whether or not you had
4  reason to believe otherwise, the basis for your
5  understanding -- or the basis of your
6  understanding of what happened to Mr. Anderson --
7  is based on what he's represented to you and to
8  other people in your practice; is that right?
9       A. And it was enough to cause him physical
10  issues for him, yes.
11       Q. Okay. Have you seen any sort of
12  biomechanical analysis that gives you -- gives you
13  a measurement -- of the amount of force that Mr.
14  Anderson was hit with?
15       A. No.
16       Q. And has there been any description to you
17  of what it was that he -- that he hit his head on?
18       A. A metal post.
19       Q. Okay. And is there any description to
20  you of how fast he was or wasn't going at the time
21  that his head hit the post?
22       A. It may have -- he may have told me and I
23  didn't write it down.
24       Q. Okay. And so as you sit here today

12 (Pages 42 - 45)

Page 46

1 that's -- the answer to that question then is no,
2 is that right?
3     A. I just said what I said.
4     Q. Okay. All right.
5         MR. HEDRICK: Okay. I think those are
6 all the questions that I have for you. If Mr.
7 Fuller has some follow-up questions I'll open the
8 floor to him.
9         MR. FULLER: Thank you.
10         EXAMINATION BY
11 MR. FULLER:
12     Q. Can you hear me okay, Doctor?
13     A. Yes.
14     Q. Again, my name's Thomas Fuller and I
15 represent Mr. Anderson, your patient back on the
16 various dates we talked about. I just have some
17 follow-up questions for you.
18         And I may share my screen with you so
19 then I can understand that we're working on the
20 same page. Okay?
21     A. Uh-huh.
22     Q. As I understand it, the first time that
23 you actually treated Mr. Anderson in your field of
24 specialty was on January 13th, 2020. Do I have

Page 47

1 that correct?
2     A. So yes. So January 13th of 2020.
3     Q. Okay. And then on that date Mr. Anderson
4 reported to you that he was hit in the head by a
5 metal post while he was operating as a conductor
6 for the BNSF Railroad; am I right?
7     A. Yeah.
8     Q. And as a result of that, I think you
9 testified to this earlier, your notes do reflect
10 that he was taken to the emergency room and had to
11 have eight stitches in his head to at least stop
12 the bleeding that he suffered from; is that right?
13     A. Yes.
14     Q. Am I also right, Doctor, that that type
15 of force or blow to the head while you're riding
16 on the side of a rail car is the type of force or
17 blow to the head that can cause a jolt to the
18 brain --
19     A. Yes.
20         MR. HEDRICK: Objection. Sorry. Go
21 ahead, Thomas. I don't want to object in the
22 middle of your question.
23         MR. FULLER: Thank you.
24 BY MR. FULLER:

Page 48

1     Q. That's the type of jolt or blow to the
2 head that can cause a concussion or mild traumatic
3 brain injury, correct?
4     A. Yes.
5         MR. HEDRICK: Objection to the form of
6 the question. Calls for speculation, incomplete
7 hypothetical. You can answer if you know. Go
8 ahead.
9         THE WITNESS: I said yes.
10 BY MR. FULLER:
11     Q. And so when you had the opportunity to
12 treat Mr. Anderson, as I understand, he reported
13 to you that he was feeling foggy, correct?
14     A. Yes.
15     Q. He was having some severe vertigo
16 episodes when he would stand and get up?
17     A. Uh-huh. Yes.
18     Q. Could you describe to the jury what
19 vertigo is for people who don't really understand
20 that terminology?
21     A. Vertigo is specific to the vestibular
22 centers and the hearing centers, so it is a
23 symptom that people complain of specifically of
24 spinning, a quality of spinning, when they --

Page 49

1 well, it just depends. But sometimes people, if
2 they move their heads in different directions or
3 if they move their head too quickly, then they can
4 result in a spinning type of sensation. And then
5 that -- you can also get nausea with that, et
6 cetera.
7     Q. Do those types of symptoms and feelings
8 in a patient affect one's balance?
9     A. Yes.
10     Q. If someone is having those types of
11 balance issues and let's say they're in a
12 safety-sensitive job where they're required to
13 ride on the side of a rail car while it's moving,
14 you think those are types of activities that the
15 person should be limited from or prevented from
16 doing in their job?
17         MR. HEDRICK: Objection. Calls for
18 speculation, calls for expert disclosure, or
19 expert testimony, for which this witness is not
20 qualified, and also incomplete hypothetical. You
21 can answer.
22         THE WITNESS: Now I forgot the
23 question. Please can you repeat the question?
24 BY MR. FULLER:

13 (Pages 46 - 49)

1    Q.  Yeah.  If a patient like Mr. Anderson is
2  suffering from vertigo, dizziness and has balance
3  issues would you agree that avoiding job tasks
4  such as climbing ladders or riding on the side of
5  rail cars should be something that should be
6  avoided for the interest of their safety?
7         MR. HEDRICK:  Same objection.
8         THE WITNESS:  Yes.
9  BY MR. FULLER:
10    Q.  Your record of January 13th, 2020 also
11  indicates that Mr. Anderson was having chronic
12  daily headaches, feeling foggy, tired, irritable,
13  and also short-term memory problems.  Also having
14  difficulty sleeping.
15         Are those all indications and signs of
16  a mild traumatic brain injury, Doctor?
17    A.  Those can be, yes.
18    Q.  And how about sensitivity to light, is
19  that another indication of a mild traumatic brain
20  injury?
21    A.  Yes, that can be it too.
22    Q.  And so ultimately if we're talking about
23  mild traumatic brain injury and concussion and
24  postconcussive symptoms, could you just describe

1  how those interlay with each other?
2    A.  We call something post concussion if it's
3  been between 30 days and three months of having
4  these chronic symptoms.
5    Q.  Is a concussion another word for mild
6  traumatic brain injury?
7    A.  Yes.
8    Q.  And am I correct, Doctor, that while some
9  patients have these symptoms resolve on their own
10  within maybe even, you know, a couple weeks to a
11  couple months, that some do experience prolonged
12  symptoms?
13    A.  Yes.
14    Q.  And you weren't Mr. -- I think this came
15  out in your questions to defense counsel -- but
16  you weren't Mr. Anderson's only treating provider;
17  am I right about that?
18    A.  Right, I was not.
19    Q.  Okay.  And so at least the complaints
20  that he was having and experiencing and reporting
21  to you as of January 2020, are those the types of
22  complaints and issues that you might expect if
23  someone were to hit their head on a metal post
24  while riding the side of a rail car?

1         MR. HEDRICK:  Objection.  Calls for
2  speculation.  Incomplete hypothetical.
3         THE WITNESS:  It's possible.
4         MR. HEDRICK:  I'm sorry, go ahead.
5         THE WITNESS:  It's possible.
6  BY MR. FULLER:
7    Q.  And then I think I just wanted to review
8  the next -- the next visit you had with Dr.
9  Anderson goes to April 21st, 2020 -- am I right?
10    A.  Yes.
11    Q.  And in your recommendations it looks
12  like, at paragraph four, at that time you were
13  indicating that Mr. Anderson should avoid
14  activities that trigger worsening of his symptoms?
15    A.  Yes.
16    Q.  Do you see that?
17    A.  Yes.
18    Q.  In other words, what I -- what I mean --
19  if let's say he is required to bend and stoop at
20  work or climb ladders and that his symptoms are
21  triggered by that, that it was your recommendation
22  that he avoid those types of activities?
23    A.  Yes.
24         MR. HEDRICK:  Object to form,

1  incomplete hypothetical, calls for speculation.
2  Go ahead.
3         THE WITNESS:  Yes.
4  BY MR. FULLER:
5    Q.  The last thing I'd like to -- and maybe
6  I'd like to address with you, Doctor -- is that
7  there's some talks about the July 16th, 2020 visit
8  that Mr. Anderson had at -- at the clinic.
9    A.  I'm sorry, what was that?  July 16th,
10  2020?
11    Q.  Yeah.
12    A.  Yep.
13    Q.  And do you see in that note -- and I'll
14  give you a chance to get there.  And I think this
15  is from -- and I'm going to not say this name
16  correctly, but --
17    A.  Jacinda, uh-huh.
18    Q.  Yeah, Cynthia.  Is it --
19    A.  Oh, that one?
20    Q.  Yeah.
21    A.  So 6/16/20 which is the -- I'm sorry.
22  Which is the date?  What's the date?
23    Q.  It's July 16th, 2020.
24    A.  So there's a visit from Jacinda.  There

Page 54

1 isn't anything from Cynthia.
2          MR. FULLER:  Maybe, Madam Court
3 Reporter, could you allow me to share my screen?
4 Right now I'm disabled.  Maybe we can go off the
5 record for just one second.
6          THE VIDEOGRAPHER:  Okay.  We're going
7 off the record at 11:22 a.m.
8          (pause)
9          THE VIDEOGRAPHER:  Back on the record
10 at 11:23 a.m.
11 BY MR. FULLER:
12     Q.  Okay, Doctor, I'm going to share my
13 screen with you here.
14     A.  Uh-huh.
15     Q.  All right.  Are you seeing my screen,
16 Doctor?
17     A.  7/16.
18     Q.  Yes.  I have a -- I'm sorry if I said
19 that wrong.  I was looking at the July 16, 2020.
20 And if you can --
21     A.  Yes, I have that one there, yes.  Uh-huh.
22     Q.  Okay.  And in that record Mr. Anderson's
23 chief complaint was still dizziness, correct?
24     A.  Yes.

Page 55

1     Q.  And at that time the providers noted that
2 they discussed with Mr. Anderson if he's at work
3 and his symptoms returned to put his head in a
4 neutral plain to minimize those symptoms.  Did I
5 read that correctly?
6     A.  Yes.
7     Q.  But then they were also recommending that
8 Mr. Anderson be provided with a harness when
9 climbing on the train ladders.  Did I read that
10 correctly?
11     A.  Yes.
12     Q.  Are you aware if anyone at the BNSF
13 allowed him to return to work with a harness?
14     A.  I have no idea.
15     Q.  Okay.  And then one of the other
16 restrictions noted in the records from the
17 providers say avoid prolonged head positions,
18 avoid ladders or scaffolding unless can be
19 harnessed, correct?
20     A.  Well, that's what it says.
21     Q.  Okay.  And Mr. Anderson's -- to the
22 extent he had ongoing complaints and treatment
23 with other providers -- I think you indicated this
24 earlier, you know, someone can't just keep driving

Page 56

1 from where he lives so far away and keep coming
2 down to your area on a regular basis to continue
3 to follow up.  And so it would be reasonable for
4 him to have treated with other providers maybe
5 closer to his home?
6     A.  Right.  Yes.
7          MR. FULLER:  Okay.  Thank you, Doctor.
8 Those are all the questions I have for you.  I
9 appreciate your time.
10          THE WITNESS:  Thank you.
11          MR. HEDRICK:  I do have a couple of
12 follow-ups.
13          FURTHER EXAMINATION
14 BY MR. HEDRICK:
15     Q.  On the 7/16/20 note from Cynthia Guede,
16 his chief complaint is dizziness, as you mentioned
17 earlier.  But what's the assessment that she
18 provides us to that symptom on that date?
19     A.  I mean, it is right here.  Do you want to
20 say it and then I can say that's fine?  I'm not
21 going to read that.
22     Q.  Sure.  At least in the note Miss Guede
23 indicates that as to the symptom of dizziness
24 there's episodic with history of right posterior

Page 57

1 BPPB is not resolved.  Did I read that correctly?
2     A.  Yes.
3          MR. FULLER:  Form.  It's the wrong
4 date.  But go ahead.
5 BY MR. HEDRICK:
6     Q.  And that's on 7/16 of '20, correct?
7     A.  Yes.
8     Q.  All right.  All right.  And you mentioned
9 that when it comes to postconcussive symptoms that
10 typically the range of time for postconcussive
11 symptoms is between 30 days to three months after
12 the -- after an incident of trauma -- is that
13 right?
14     A.  It just gets classified if it's longer.
15     Q.  Okay.  And what's the classification for
16 someone who continues to experience prolonged
17 symptoms after that time period, or that window of
18 time?
19     A.  I mean, it's chronic postconcussive
20 syndrome.
21     Q.  Okay.  And was Mr. Anderson assessed with
22 chronic postconcussive syndrome by anyone at INI?
23     A.  I guess it's -- I don't know if someone's
24 written it down.  It's knowledge.

15 (Pages 54 - 57)

Page 58

1  Q. Okay.
2  A. You assume that that's -- that's what it
3 is --
4  Q. Okay.
5  A. -- or what they're referring to.
6  Q. All right. So if it's not listed as an
7 assessment it's an assumption that yes, this is
8 what's going on with this patient?
9  A. Yes.
10  Q. But it's not in the records then?
11  A. I don't know if it's -- if they have
12 written it in their records.
13     MR. HEDRICK: Okay. All right. I
14 think those are all the questions that I've got
15 for you. Thomas, any follow-up?
16     MR. FULLER: Just briefly, Doctor.
17     FURTHER EXAMINATION BY
18 MR. FULLER:
19  Q. I'm sharing my screen with you again,
20 which is going back to the visit date of July 16,
21 2020. And do you see in these records that
22 indicate Mr. Anderson was indeed suffering from
23 postconcussive syndrome?
24  A. Right. So they -- so they've --

Page 59

1 someone's written it down then. Okay.
2  Q. And so if I'm understanding that
3 correctly, postconcussive syndrome is a type of
4 diagnosis that may happen when a person like Mr.
5 Anderson continues to suffer from these types of
6 ailments?
7  A. Right.
8  Q. And they go unresolved and they can be
9 very difficult, especially in the field of
10 neurology, to treat. And they're also hard to
11 live with, aren't they?
12     MR. HEDRICK: Objection. Compound,
13 complex question. You can answer.
14     THE WITNESS: Yes.
15     MR. FULLER: Okay. And I appreciate
16 your time. Thank you, Doctor.
17     THE WITNESS: Okay.
18     FURTHER EXAMINATION BY
19 MR. HEDRICK:
20  Q. And, Doctor, is there -- is there a
21 meaningful distinction to be made -- between
22 chronic postconcussive versus postconcussive
23 symptoms? Strike that. Is there a -- is there a
24 meaningful difference in the neurology field --

Page 60

1 between postconcussive syndrome and chronic post
2 concussive syndrome?
3  A. No, not really.
4  Q. Okay. So postconcussive syndrome can
5 refer to symptoms that are experienced within the
6 30 day to three month window but it could refer to
7 symptoms experienced beyond that window; is that
8 correct?
9  A. So it doesn't specify -- it doesn't
10 specify it like that. It's everything after that
11 point.
12  Q. Okay.
13  A. It's that you wouldn't call someone post
14 concussive if they come in two weeks after they've
15 had concussion. That doesn't apply then. But
16 everything after a point, then it continues on
17 with that.
18  Q. Okay. So in the --
19     MR. HEDRICK: Actually no further
20 questions.
21     THE WITNESS: Okay.
22     MR. FULLER: I don't have anything
23 further. Thank you, Doctor.
24     THE WITNESS: Thank you so much.

Page 61

1 Thank you.
2     THE VIDEOGRAPHER: We're going off the
3 record.
4     MR. HEDRICK: Wait, wait, wait.
5     THE VIDEOGRAPHER: Go ahead. Go
6 ahead.
7     MR. HEDRICK: Doctor, you have the
8 option of doing two things with the transcript
9 here. Either you can waive --
10     THE WITNESS: Yes, I'm going to waive
11 it.
12     MR. HEDRICK: Okay.
13     THE WITNESS: I'll waive it.
14     MR. HEDRICK: Show signature waived,
15 and that concludes the deposition.
16     THE WITNESS: All right.
17     MR. HEDRICK: Thank you, Doctor.
18     THE WITNESS: All right. Thank you.
19     THE VIDEOGRAPHER: All right. We're
20 going off the record at 11:30 a.m.
21
22     FURTHER DEPONENT SAYETH NOT
23     SIGNATURE WAIVED
24     (Deposition end time: 11:30 a.m.)

16 (Pages 58 - 61)

Page 62

1    CERTIFICATE OF REPORTER

2

3        I, Kathy L. Johnson, a Certified Court

4    Reporter, within and for the State of Illinois,

5    DO HEREBY CERTIFY that the witness whose

6    testimony appears in the foregoing deposition was

7    duly sworn by me to testify to the truth and

8    nothing but the truth; that the testimony of said

9    witness was taken by stenographic means by me to

10   the best of my ability and thereafter reduced to

11   print under my direction.

12       I further certify that I am neither

13   attorney nor counsel for, nor related, nor

14   employed by any of the parties to the action in

15   which this deposition was taken; further, that I

16   am not a relative or employee of any attorney or

17   counsel employed by the parties hereto, or

18   financially interested in this action.

19

20       *Kathy Johnson*

         Kathy Johnson

21       Lic. No.:  084-03071

22

23

24

Veritext Legal Solutions

800-567-8658                                             973-410-4098

**&**

**&**   3:3

**0**

**003298**   10:16
**003358**   10:17
**084-03071**
   62:21

**1**

**1**   2:13
**1-4**   4:1
**1000**   3:4
**101**   3:4
**10:14**   1:19 4:3
   4:7
**10:32**   23:3
**10:41**   23:6
**11:22**   54:7
**11:23**   54:10
**11:30**   61:20,24
**12**   1:6
**13th**   30:13
   46:24 47:2
   50:10
**16**   54:19 58:20
**1689**   62:20
**16th**   27:5 38:18
   39:1,2 53:7,9
   53:23
**19th**   9:3

**2**

**2**   2:14
**20**   57:6
**200**   1:20

**2005**   14:17
   16:17
**2010's**   15:8
**2019**   23:19
   27:1,5 29:17
   30:20
**2020**   30:13
   34:6,8,22 36:6
   36:11 38:14,19
   39:1 46:24
   47:2 50:10
   51:21 52:9
   53:7,10,23
   54:19 58:21
**2023**   1:18 4:6
   9:1,3
**211**   3:9
**21st**   34:5 36:11
   52:9
**22nd**   30:19
**29th**   9:1 27:1

**3**

**3**   2:15
**30**   51:3 57:11
   60:6
**309-296-0121**
   3:10
**30th**   27:4
**3:22**   1:6

**4**

**4**   2:6,13,14,15
   2:16,16
**4/21**   36:6

**46**   2:7

**5**

**5**   29:17
**5/2**   23:19
**5/2/2019**   23:21
**55391**   3:5
**56**   2:8
**58**   2:9
**59**   2:10

**6**

**6/16/20**   53:21
**612-339-4511**
   3:5
**61602**   3:10
**61603**   1:21
**62**   2:22

**7**

**7/16**   54:17 57:6
**7/16/20**   39:5
   41:19 56:15

**9**

**9/5/19**   30:6
**9th**   1:18 4:6

**a**

**a.m.**   1:19 4:3,7
   23:3,6 54:7,10
   61:20,24
**ability**   62:10
**able**   20:24 21:5
   22:10,16
**above**   15:14
**access**   20:24
   21:4,5 35:10

**accident**   5:22
   5:24 6:6
**accurate**   8:4
   40:17 44:4
**acquired**   15:7
**action**   9:3
   62:14,18
**activities**   49:14
   52:14,22
**actual**   29:2
**actually**   20:23
   46:23 60:19
**addition**   20:20
**address**   35:3
   37:4 53:6
**affect**   49:8
**affiliated**   13:19
**agree**   50:3
**ah**   15:15
**ahead**   23:6
   28:9 40:22
   47:21 48:8
   52:4 53:2 57:4
   61:5,6
**ailments**   59:6
**alarming**   37:4
   37:15,16
**alleges**   42:1
**allow**   54:3
**allowed**   55:13
**alzheimer's**
   19:9
**amended**   8:23
**amount**   45:13

**analysis** 45:12
**anderson** 1:4
  4:23 5:2,7
  10:12,16,17
  11:16 18:15,16
  22:1 23:10,17
  25:15 26:21,23
  28:17 29:2,7
  30:8,11,22
  31:2,10,20
  32:22 33:4,16
  33:18 34:4
  36:7,12,15
  38:7,14 39:19
  41:14 42:11
  45:6,14 46:15
  46:23 47:3
  48:12 50:1,11
  52:9,13 53:8
  55:2,8 57:21
  58:22 59:5
**anderson's**
  11:11,14,18
  19:13 22:7
  41:21 44:15
  51:16 54:22
  55:21
**answer** 6:23
  7:2,5,16 8:1,4,8
  8:14,14 25:12
  25:17 43:19
  46:1 48:7
  49:21 59:13
**anymore** 17:12
  20:24 40:15

**appeared** 3:6
  3:11
**appears** 18:14
  38:17 62:6
**apply** 1:15
  60:15
**appointment**
  12:21 39:3
**appreciate** 11:6
  15:24 56:9
  59:15
**approved**
  13:22
**april** 34:5,22
  36:11,17 38:14
  52:9
**area** 17:6 19:4
  41:8 56:2
**arranged** 16:3
**asked** 4:21 7:20
  10:18 12:6
**asking** 5:4 26:8
  27:14 29:1
  38:21
**assess** 20:8
**assessed** 57:21
**assessing** 20:10
**assessment**
  25:1,14 29:5
  30:7 32:21
  38:6 39:18
  56:17 58:7
**assistant** 24:7
  24:11

**assistants**
  19:20 20:8
**assume** 58:2
**assumption**
  58:7
**attached** 2:17
**attending**
  16:15 17:18
**attendings**
  17:19
**attorney** 62:13
  62:16
**audiologist**
  30:2
**available** 10:6
  10:21 35:17
**avenue** 1:21
**avoid** 52:13,22
  55:17,18
**avoided** 50:6
**avoiding** 50:3
**awards** 9:19
**aware** 55:12
**awhile** 14:14

| b |
|---|

**b** 2:12
**back** 19:7
  21:13 22:11
  23:5 26:18
  34:18,19 36:22
  36:24 37:6
  39:14 40:1,16
  41:9 42:3
  46:15 54:9
  58:20

**balance** 49:8,11
  50:2
**base** 15:4
**based** 5:20 25:9
  25:18,18 35:1
  38:6 39:18
  40:12 41:13
  42:10 44:10,17
  44:17 45:7
**basically** 26:18
  32:14 39:22
  40:10
**basis** 43:4
  44:11 45:4,5
  56:2
**basketball** 8:12
**bates** 10:15
**becoming** 15:1
**behalf** 3:6,11
**believe** 24:15
  24:19 27:22
  32:7,18 35:5
  44:21,21,24
  45:4
**bend** 52:19
**best** 8:3 11:2,2
  11:4 14:7
  19:12 21:20
  24:10 29:10
  42:9 62:10
**better** 19:4
  28:3 33:1,10
  38:5,8 40:24
**beyond** 60:7

**biomechanical** 45:12
**bit** 7:22 18:19 22:4,5 33:10
**bleeding** 47:12
**blow** 47:15,17 48:1
**bnsf** 1:7 4:24 5:3 10:16,17 47:6 55:12
**board** 12:24 13:2
**bppb** 57:1
**bradley** 1:4 4:23 10:12 21:24 23:10
**brain** 6:1,4 33:12 47:18 48:3 50:16,19 50:23 51:6
**break** 8:16 22:18 23:4
**breaks** 8:18
**brief** 6:17,19 11:23 12:7,13
**briefly** 18:13 23:9 58:16
**brought** 9:23

**c**

**c** 3:1 24:9
**c.s.r.** 1:17
**call** 8:12 39:6 40:2,16 41:1 51:2 60:13

**called** 1:13
**calls** 41:18,18 48:6 49:17,18 52:1 53:1
**camera** 24:17
**capacity** 29:21
**car** 5:22,24 6:6 47:16 49:13 51:24
**care** 19:2,18 23:14 24:24 27:21 28:1,15 34:15 36:10,15 36:20
**cars** 50:5
**case** 1:6 5:18 10:10,24 11:20 22:15
**cases** 5:14 40:11
**cause** 45:9 47:17 48:2
**caused** 42:19 43:6 44:18
**center** 3:4
**centers** 48:22 48:22
**certain** 5:19 9:6 20:9
**certificate** 2:22 62:1
**certified** 12:24 13:2,21 62:3
**certify** 62:5,12

**cetera** 49:6
**chance** 53:14
**changed** 15:21
**chart** 10:3,5 11:9 20:18 22:4,20 26:7 27:8 31:5 41:14
**chief** 23:22 30:14 54:23 56:16
**choice** 17:8
**chronic** 50:11 51:4 57:19,22 59:22 60:1
**circumstances** 5:13
**civil** 1:15 9:2
**clarify** 15:24
**classification** 57:15
**classified** 57:14
**clear** 7:22 43:18
**climb** 52:20
**climbing** 50:4 55:9
**clinic** 17:2,12 17:16,21 18:4 18:8,11,22 19:14,23 24:12 24:14,19 28:7 30:3 39:11 41:2 53:8

**clinical** 31:15
**clinics** 13:22
**closed** 6:7,11 16:20,23 17:20 18:6 19:5
**closer** 56:5
**colleagues** 5:1 11:11
**come** 22:16 34:19 36:18 40:15 41:2 60:14
**comes** 39:14,24 40:1,16 57:9
**comfortable** 27:18
**coming** 9:15,20 29:13 41:9 56:1
**comment** 27:11 38:21
**common** 7:14
**company** 1:7
**complain** 48:23
**complaining** 41:14
**complains** 42:19
**complaint** 23:22 30:14 54:23 56:16
**complaints** 51:19,22 55:22
**completely** 39:13 40:8

**complex** 59:13
**compound**
  59:12
**computer** 10:2
  12:10 21:20
  22:20
**concerned**
  37:11,23
**concludes**
  61:15
**concussion**
  17:2,21 18:4,8
  18:22 19:6,14
  19:23 24:12,13
  24:19 28:7
  48:2 50:23
  51:2,5 60:15
**concussions**
  33:14
**concussive** 60:2
  60:14
**condition** 25:2
  42:20,23 43:6
  44:19
**conductor** 42:8
  47:5
**confirm** 26:8
**connect** 21:9
**connected**
  21:10
**consider** 24:23
**consideration**
  9:24 20:11
**constantly** 41:9

**continue** 56:2
**continued**
  36:21
**continues**
  57:16 59:5
  60:16
**continuing**
  34:17 39:20
**conversation**
  7:15 11:23
**copy** 9:10
**cornick** 24:2,3
  24:11 25:3,13
  25:15 26:21,22
  27:12 28:13
  29:7,8 30:5
  36:10
**corporation**
  1:7
**correct** 13:10
  15:9 19:16,19
  32:18 40:13
  47:1 48:3,13
  51:8 54:23
  55:19 57:6
  60:8
**correctly** 14:1
  32:15 39:17
  53:16 55:5,10
  57:1 59:3
**counsel** 11:19
  27:17 51:15
  62:13,17
**county** 1:17

**couple** 15:1
  17:19 51:10,11
  56:11
**course** 33:4
  36:14 37:17
  38:2
**court** 1:1 4:9
  7:8 54:2 62:3
**credentialed**
  14:6,8
**credentials**
  13:14
**criticize** 27:15
**cs5687740** 1:24
**curto** 3:16
**cv** 1:6 9:7,10,11
  9:23 14:17
**cynthia** 29:17
  38:19 39:7,17
  53:18 54:1
  56:15

### d

**d** 2:1 29:18
**daily** 50:12
**damage** 37:12
**date** 4:6 24:1
  25:15 27:7
  29:16 31:3
  38:24 42:1
  47:3 53:22,22
  56:18 57:4
  58:20
**dates** 46:16
**day** 24:22 60:6

**days** 40:7 51:3
  57:11
**deals** 33:11
**death** 5:23 6:3
  6:11
**defendant** 1:8
  3:12
**defendant's**
  8:23
**defense** 51:15
**delaware** 1:7
**department**
  16:16
**depends** 49:1
**deponent** 61:22
**deposition** 1:12
  4:3,5 5:10 6:16
  8:24 9:2 10:1
  11:8,12 12:3
  61:15,24 62:6
  62:15
**depositions**
  1:16 6:16 8:13
**describe** 48:18
  50:24
**description**
  45:16,19
**determine** 5:17
**determined**
  20:2
**determining**
  24:24,24 25:1
  28:15
**diagnose** 20:8

**diagnosis** 16:22
  25:14 28:16
  59:4
**difference** 45:2
  59:24
**different** 19:18
  34:9 35:7,17
  37:12 39:13
  49:2
**difficult** 59:9
**difficulty** 21:6
  21:13 50:14
**digital** 10:5,20
**direction** 62:11
**directions** 49:2
**disabled** 54:4
**disagree** 25:8,9
  25:11 27:14
**discharge**
  36:19 39:10
**discharged**
  38:18
**disclosure**
  49:18
**discuss** 5:20
**discussed** 11:10
  11:14,18,22
  23:9 55:2
**discussions**
  39:18
**distinction**
  59:21
**district** 1:1,2
**division** 1:3
  18:15 19:22

**divisions** 35:17
**dizziness** 18:20
  50:2 54:23
  56:16,23
**doctor** 4:8,16
  4:21 10:6,18
  23:8 24:16
  28:9 40:13,22
  46:12 47:14
  50:16 51:8
  53:6 54:12,16
  56:7 58:16
  59:16,20 60:23
  61:7,17
**doctor's** 27:17
**document**
  26:15 28:4
**documents** 9:6
**doing** 20:18
  42:16 49:16
  61:8
**dr** 8:24 9:3
  18:5,12,17
  22:19 33:11,16
  33:19,23 34:20
  34:23 37:1
  38:15,19 52:8
**drive** 3:4
**driver** 42:7
**driving** 55:24
**duly** 4:12 62:7
**duties** 41:22,24
  42:12 43:3

**e**

**e** 1:20 2:1,12
  3:1,1 29:18,18
**earlier** 10:9
  24:22 47:9
  55:24 56:17
**eastern** 1:3
**easy** 32:11
**edification** 14:2
**education** 12:8
  12:14
**eight** 47:11
**either** 61:9
**emergency**
  43:17 47:10
**employed**
  14:21 62:14,17
**employee** 62:16
**encounter** 31:4
  31:7
**engagements**
  9:15
**entailed** 42:17
**entity** 15:17
  35:12
**episodes** 30:16
  48:16
**episodic** 56:24
**especially** 59:9
**et** 49:5
**exactly** 7:12
**examination**
  1:13 2:5 4:14
  31:15 46:10
  56:13 58:17

  59:18
**examined** 4:12
**excuse** 24:16
**exercises** 35:22
**exhibit** 2:13,14
  2:15,16 8:22
  9:1,22 10:13
  22:13
**exhibits** 4:1
**expect** 31:13
  37:18 51:22
**experience** 5:21
  9:19 12:8,14
  39:20 51:11
  57:16
**experienced**
  44:11 60:5,7
**experiencing**
  40:5,11 51:20
**expert** 49:18,19
**explain** 37:15
**explained**
  27:24
**extent** 55:22
**extra** 33:7

**f**

**fair** 7:2 8:4
  27:20 32:19
**falls** 18:16
**familiar** 24:3
  29:18 38:1
**far** 56:1
**fast** 45:20
**february** 1:18
  4:6

| | | | |
|---|---|---|---|
| **federal**  1:14 | **forgot**  49:22 | **g** | 25:22,24 26:17 |
| **feeling**  32:2,3 | **form**  27:17 | | 27:11 32:9 |
| 48:13 50:12 | 28:8,9 40:18 | **g**  29:18 | 33:7 34:20 |
| **feelings**  49:7 | 40:21,22 42:21 | **gales**  41:10 | 45:20 53:15 |
| **feels**  40:7,8 | 44:16 48:5 | **galesburg**  35:9 | 54:6,12 56:21 |
| **fell**  43:8,16 | 52:24 57:3 | 41:8 | 58:8,20 61:2 |
| **fellowship**  16:5 | **forward**  23:15 | **game**  8:11 | 61:10,20 |
| 16:6,7 | **fouls**  8:12 | **gather**  28:22 | **good**  4:16,17 |
| **field**  12:9,16 | **foundation** | **gathered**  30:23 | 8:21 19:1 |
| 13:4 46:23 | 27:23 38:9 | **general**  12:21 | **goofiness**  7:20 |
| 59:9,24 | **four**  10:14 | 16:8 | **gracious**  9:9 |
| **figure**  20:17 | 22:13 29:8 | **generally**  16:21 | **gradually**  33:1 |
| **filed**  4:23 | 52:12 | 17:4 19:24 | **group**  14:2,17 |
| **financially** | **francis**  13:17 | **gentleman** | 14:18,22 16:17 |
| 62:18 | 13:18 14:3 | 21:24 | **guede**  29:18,19 |
| **fine**  43:16 | **froze**  12:10 | **gestures**  7:14 | 29:21 30:6 |
| 56:20 | **fuller**  2:7,9 3:3 | **getting**  33:1,10 | 36:10 38:19 |
| **finish**  6:22 7:1 | 5:6 22:21 | 38:8 40:6 | 39:17 40:4,13 |
| **first**  4:12 5:17 | 27:16 28:8 | **give**  15:8 25:15 | 56:15,22 |
| 23:17 30:10 | 38:9 40:18,21 | 53:14 | **guess**  17:5 19:3 |
| 37:5 46:22 | 42:21 46:7,9 | **gives**  44:11 | 28:3 42:6 |
| **floor**  46:8 | 46:11,14 47:23 | 45:12,12 | 57:23 |
| **focus**  16:10 | 47:24 48:10 | **glad**  33:9 | **h** |
| **foggy**  32:2 | 49:24 50:9 | **go**  6:16 17:3,23 | |
| 48:13 50:12 | 52:6 53:4 54:2 | 20:18 22:23 | **h**  2:12 |
| **follow**  26:20 | 54:11 56:7 | 23:6 28:9 | **hand**  7:14 |
| 34:7,10 35:24 | 57:3 58:16,18 | 33:23 34:18 | **handing**  22:12 |
| 36:11 39:15 | 59:15 60:22 | 37:6 40:22 | **happen**  59:4 |
| 46:7,17 56:3 | **fulton**  3:9 | 47:20 48:7 | **happened** |
| 56:12 58:15 | **funneled**  17:14 | 52:4 53:2 54:4 | 43:12 44:12,16 |
| **follows**  4:13 | 17:15 | 57:4 59:8 61:5 | 44:16 45:6 |
| **force**  45:13 | **further**  56:13 | 61:5 | **harass**  26:2 |
| 47:15,16 | 58:17 59:18 | **goes**  40:9 52:9 | **hard**  59:10 |
| **foregoing**  62:6 | 60:19,23 61:22 | **going**  8:17 13:1 | **harness**  55:8,13 |
| | 62:12,15 | 22:8,10 23:2 | **harnessed** |
| | | 23:15 25:12,21 | 55:19 |

**head** 6:8,11
7:10,11 16:21
16:23 17:20
18:6 19:5 31:4
31:7 33:5
45:17,21 47:4
47:11,15,17
48:2 49:3
51:23 55:3,17
**headache** 32:1
33:8
**headaches** 19:7
34:16 50:12
**heads** 49:2
**hear** 7:19,23
8:6 12:11
44:21 46:12
**heard** 44:11
**hearing** 48:22
**hedrich** 23:7
**hedrick** 2:6,8
2:10 3:9,11
4:15 5:3 22:17
22:23 24:20
28:2,12 38:12
41:4 42:22
46:5 47:20
48:5 49:17
50:7 52:1,4,24
56:11,14 57:5
58:13 59:12,19
60:19 61:4,7
61:12,14,17
**help** 22:16,19

**helping** 15:24
**henry** 1:18
**hereto** 62:17
**history** 25:3,8
56:24
**hit** 45:14,17,21
47:4 51:23
**hlklaw.com** 3:6
**home** 56:5
**honest** 8:3
**honors** 9:19
**hopefully** 21:13
22:24
**hospital** 5:23
6:3,10 14:21
35:9
**hospitals** 13:14
13:20,22 14:3
14:10
**hour** 1:19
**huh** 9:5,8 19:21
46:21 48:17
53:17 54:14,21
**hunegs** 3:3
**hypothetical**
48:7 49:20
52:2 53:1

**i**

**idea** 55:14
**identification**
4:2
**identified** 4:22
**il** 1:21 3:10
**illinois** 1:18,19
10:6,10 12:22

13:8,9 15:6
23:11 62:4
**illness** 25:3
**important** 6:21
7:4 29:4
**improved**
34:17
**improving**
38:10
**incident** 6:3
42:19 43:5
44:5,6,16,18
57:12
**include** 20:19
**included** 10:22
**including** 9:7
**incomplete**
48:6 49:20
52:2 53:1
**indicate** 32:5
34:22 58:22
**indicated** 55:23
**indicates** 50:11
56:23
**indicating**
52:13
**indication**
30:17 50:19
**indications**
50:15
**information**
28:18,21 29:4
30:21,23 40:12
40:14

**ini** 5:1 14:19,22
15:1,7,21 18:4
18:16 19:5,24
23:18,24 29:22
35:6 38:18,23
41:14 57:22
**ini's** 19:19
**injured** 42:13
43:4,22
**injuries** 16:21
16:24 18:6
19:6 33:12
38:2
**injury** 6:1,4,8
6:12 17:20
33:1 37:19
41:21 42:2,17
43:16 48:3
50:16,20,23
51:6
**instance** 17:11
**institute** 1:20
10:7,11 15:7
23:12
**interest** 50:6
**interested**
62:18
**interesting**
21:1
**interlay** 51:1
**interview** 31:15
31:15
**introductory**
11:23

| | | | |
|---|---|---|---|
| **involve**  6:1,4,7  6:11 | **judge**  8:10 | 29:10 33:18,20 | **longer**  40:4 |
| **involved**  36:23 | **july**  26:24 | 38:22 41:13 | 57:14 |
| **iowa**  1:2 | 38:18 39:1,2 | 42:10 44:5,10 | **look**  19:15 22:8 |
| **irritable**  32:2 | 53:7,9,23 | 57:24 | 42:3 |
| 50:12 | 54:19 58:20 | **known**  43:11 | **looked**  22:4 |
| **isabel**  3:15 | **jury**  48:18 | **kvas**  3:3 | **looking**  54:19 |

| **k** | | **l** | **looks**  12:23 |
|---|---|---|---|

| | | | |
|---|---|---|---|
| **issued**  8:24 9:3  10:10 | **kathy**  1:16 62:3  62:20 | **l**  1:16 62:3 | 13:6 24:5 |
| **issues**  31:23 | **keep**  41:9 55:24 | **lack**  19:4 40:11 | 26:24 29:6,15 |
| 45:10 49:11 | 56:1 | **lacks**  27:23 | 36:9 52:11 |
| 50:3 51:22 | **kind**  6:8,12 | **ladders**  50:4 | **lot**  17:19 18:6 |
| | 8:11,11 | 52:20 55:9,18 | 33:11 |

| **j** | | **laptop**  10:22 | **m** |
|---|---|---|---|

| | | | |
|---|---|---|---|
| **jacinda**  24:2  53:17,24 | **knight**  3:8 | **late**  15:8 | **m.d.**  1:13 2:3 |
| **jankowska** | **knightnicastr...** | **lawsuit**  4:23 | 4:5,11 |
| 18:5,17 33:11 | 3:11 | **lawsuits**  5:21 | **mackay**  3:8 |
| 33:16,19,23 | **know**  5:17 6:15 | **legal**  26:14,15 | **madam**  54:2 |
| 34:20,23 37:1 | 8:16 13:23 | **leneave**  3:3 | **made**  41:17 |
| 38:15 | 14:18 18:9 | **level**  5:21 | 59:21 |
| **jankowska's** | 20:1,2,5 22:3 | **levels**  19:18 | **major**  37:22 |
| 18:12 | 24:5,9,21 | **lic**  62:21 | **make**  7:16 29:1 |
| **january**  8:24 | 25:23 26:6,15 | **licenses**  13:7 | 29:4 31:10 |
| 9:3 30:12 34:8 | 27:10,11 32:13 | **light**  50:18 | 33:15 34:14 |
| 46:24 47:2 | 35:2,7,24 37:8 | **limited**  49:15 | 44:21 45:2 |
| 50:10 51:21 | 37:9 38:14 | **link**  5:6 7:19 | **makes**  32:10 |
| **job**  1:24 20:18 | 40:1,15 41:2,6 | **listed**  9:16 58:6 | **march**  30:19 |
| 41:21,24 42:12 | 41:10,21,24 | **little**  18:19 22:4 | **marked**  4:1 |
| 42:17 43:2 | 42:5,11,16 | 22:5 33:10 | 8:22 9:22 |
| 44:1 49:12,16 | 43:2,8,19 44:7 | **live**  59:11 | 10:13 22:13 |
| 50:3 | 44:23 48:7 | **lives**  41:7,10,10 | **mary's**  35:9 |
| **johnson**  1:16 | 51:10 55:24 | 56:1 | 36:2 |
| 3:15 62:3,20 | 57:23 58:11 | **llc**  3:8 | **materials**  9:24 |
| **jolt**  47:17 48:1 | **knowledge** | **locked**  12:11 | **mattai**  1:13 2:3 |
| | 10:20 11:4 | **long**  8:18,19 | 4:5,11,20 8:24 |
| | 14:7 24:11 | | 9:4 10:13,13 |

22:13,19

**matter** 5:24 6:6
6:11

**mean** 14:8 15:4
20:13 25:24
28:23 37:8,15
37:21 38:3
43:10 44:1
52:18 56:19
57:19

**meaningful**
59:21,24

**means** 62:9

**measurement**
45:13

**medical** 12:9
12:15,17 13:4
13:6,7 14:2,17
14:18,22 16:17
20:7,14 22:14
26:14

**memory** 19:8
32:3 34:16
50:13

**mentioned**
18:13 24:13,22
37:14 56:16
57:8

**merger** 14:19
14:20

**met** 29:7

**metal** 45:18
47:5 51:23

**middle** 47:22

**mild** 48:2 50:16
50:19,23 51:5

**mind** 22:18

**minimize** 55:4

**minneapolis**
3:5

**mischaracteri...**
32:16

**mistaken** 16:1

**mitch** 5:2

**mitchell** 3:9

**mn** 3:5

**moment** 19:2

**month** 60:6

**months** 51:3,11
57:11

**morning** 4:16
4:17 21:5

**mouth** 32:16

**move** 49:2,3

**moving** 49:13

**mri** 33:5 37:8
37:13,22

**n**

**n** 2:1 3:1

**name** 4:18 5:2
18:12 53:15

**name's** 46:14

**named** 21:24
29:17

**naprosyn** 33:8

**nature** 23:9
38:3 41:20

**nausea** 49:5

**nauseated** 40:6

**necessarily**
18:10 36:16

**neck** 23:22

**need** 5:16 8:19
17:13 39:14
40:15 43:10

**needed** 39:22

**needs** 39:15

**neither** 62:12

**neurologic**
18:23

**neurological**
1:20 10:7,11
15:6 23:11
38:1

**neurologist**
12:21 16:8
17:20,22 18:3
18:5,10

**neurologists**
18:3

**neurology**
16:11,14,16
59:10,24

**neuropathies**
19:8

**neurosurgeons**
18:9

**neurosurgery**
18:11

**neutral** 55:4

**never** 15:10,21

**new** 34:9

**nicastro** 3:8

**nod** 7:10,11

**normal** 7:14
17:7 19:4
31:16 36:14
38:2 40:8

**normally** 37:10

**northwestern**
12:17

**nos** 4:1

**notary** 1:17

**note** 25:7 39:7
43:15 53:13
56:15,22

**noted** 25:3 55:1
55:16

**notes** 32:10
42:3 43:12
47:9

**notice** 8:23

**number** 9:1,23
14:3

**o**

**oaks** 3:4

**oath** 4:12 6:19

**object** 27:16
47:21 52:24

**objected** 28:8
40:21

**objection** 47:20
48:5 49:17
50:7 52:1
59:12

**objections** 8:6

observations
  24:23
observed   43:7
  44:10
obvious   6:21
obviously   8:10
occasion   40:7
occasions   29:8
office   22:19
oh   15:12 27:4,6
  53:19
okay   5:5,8,9,24
  6:6 7:4,16,23
  8:9,14,15,20,21
  10:4 11:2,6,10
  12:2,23 14:12
  14:23 15:19
  16:2,9,13 17:1
  17:4,24 18:7
  18:12,21 19:1
  19:18 20:2,6
  20:12 21:8,12
  21:22 22:22,23
  23:16 24:21
  25:17 26:12
  27:10 28:3,20
  28:23 29:5,15
  29:24 30:10,14
  30:21 31:14
  32:5,8,14,21,21
  33:3,6,13,21
  34:12,21 35:1
  35:10,14,20
  36:4,9,19 37:2
  37:7,24 38:13

38:17,20 39:4
39:8,9,12 40:3
40:14 41:12,20
42:6,9 43:9,13
44:14 45:1,11
45:19,24 46:4
46:5,12,20
47:3 51:19
54:6,12,22
55:15,21 56:7
57:15,21 58:1
58:4,13 59:1
59:15,17 60:4
60:12,18,21
61:12
one's   49:8
ongoing   55:22
onset   30:18
  31:3,11,22
open   46:7
operating   47:5
opinion   38:7
  44:17
opinions   42:18
opportunity
  48:11
opposed   17:7
  19:5 20:4
option   61:8
order   37:10
ordered   37:8
  37:13
ordinarily   18:3
  28:5,14

ordinary   44:20
osf   13:16,17,19
  13:22 14:2,3,7
  14:17,18,19,21
  15:7,11,13,17
  15:21 16:16
  35:17 36:2
osf's   14:9
outside   41:11
overview   12:7
overwhelmed
  32:3
own   8:12 14:2
  20:20 28:21
  51:9

**p**

p   3:1,1,9
p.a.   3:3
pa   20:3 36:24
  37:6
pa's   19:23
  20:19 24:24
  36:21
pac   24:5
page   2:5 46:20
paid   15:20
pain   19:7 23:23
paper   21:2,18
paragraph
  52:12
parkinson's
  19:9
part   15:10
  20:13 31:14,17
  40:6

particular   13:3
  16:10 17:6
  25:7,7 40:19
parties   62:14
  62:17
pat   3:16
patient   18:23
  20:3 24:22
  28:6,16 31:16
  36:15 38:18
  46:15 49:8
  50:1 58:8
patient's   10:3,4
  18:20 25:2
patients   14:9
  16:20,22,23
  17:13,22 20:9
  44:22 51:9
pause   54:8
pending   8:19
pennsylvania
  1:20
people   25:17,22
  37:24 45:8
  48:19,23 49:1
peoria   1:21
  3:10 12:20
  13:15 14:15
  41:3,11
performing
  42:12
period   57:17
person   6:21
  20:14 21:20
  29:17 49:15

59:4
**personal** 44:5,9
**perspective**
 18:23
**physical** 10:22
 21:16 34:19
 35:2,8,11 45:9
**physician**
 16:16 19:19
 20:4,6
**physician's**
 20:7 24:7,11
**physicians**
 19:20,23
**pickup** 8:12
**place** 37:5 44:6
**plain** 55:4
**plaintiff** 1:5 3:7
 25:1
**please** 4:19
 6:18 7:21 8:6
 8:14 12:12
 49:23
**point** 15:7
 60:11,16
**positions** 55:17
**possible** 52:3,5
**post** 45:18,21
 47:5 51:2,23
 60:1,13
**postconcussive**
 50:24 57:9,10
 57:19,22 58:23
 59:3,22,22
 60:1,4

**posterior** 56:24
**potential** 16:20
**practice** 17:6,7
 19:5,19 20:8
 31:17 45:8
**practiced** 12:19
**preparation**
 11:8,12 30:7
**prepare** 12:3
**present** 3:14
 25:3 43:21
**presentation**
 19:13 23:21
**presume** 8:1
**pretty** 6:20
 43:18
**prevented**
 49:15
**previous** 34:11
**previously** 40:5
 41:15,16 42:14
**print** 62:11
**prior** 29:13
 30:24 31:23
 34:7
**probably** 6:15
 15:1 43:12
**problems** 19:8
 32:3,3 50:13
**procedure** 1:15
**process** 15:1
 16:21
**prolonged**
 51:11 55:17
 57:16

**provide** 7:1
 9:10 12:7,13
 31:10
**provided** 5:1
 8:3 10:23,24
 28:16 30:22
 55:8
**provider** 23:24
 35:7 51:16
**providers**
 27:19 28:1
 55:1,17,23
 56:4
**provides** 39:17
 56:18
**provisions** 1:14
**public** 1:17
**publications**
 9:14
**pulled** 17:6
**pursuant** 1:14
**put** 26:16 30:19
 32:15 42:4
 44:22 55:3

**q**

**qualified** 49:20
**quality** 48:24
**question** 6:10
 6:23 7:1,20 8:2
 8:8,19 10:18
 13:2 27:17
 28:9,10 30:4
 44:8 46:1
 47:22 48:6
 49:23,23 59:13

**question's** 7:18
**questions** 5:4,8
 7:5 23:14
 26:20 27:23
 46:6,7,17
 51:15 56:8
 58:14 60:20
**quickly** 49:3
**quite** 42:7

**r**

**r** 3:1
**rail** 47:16
 49:13 50:5
 51:24
**railroad** 41:22
 47:6
**railway** 1:7
 4:24 5:3
**range** 57:10
**rarely** 16:23
 17:3
**rather** 18:17
**read** 25:5 26:4
 26:7 55:5,9
 56:21 57:1
**reading** 25:9
 26:18 39:16
**really** 25:16,22
 40:6 48:19
 60:3
**realm** 37:18
**reason** 5:16
 20:23 23:20
 25:9 33:21
 37:5 44:24

45:4
**reasonable**
  56:3
**reasons** 27:24
**recall** 21:24
  22:6 29:11
  30:24 31:1,2,4
  31:6 36:12
**recap** 6:19
**received** 22:14
**recent** 5:22
  9:11
**recollection**
  19:12 33:22
**recollections**
  23:10
**recommendat...**
  39:21 52:21
**recommendat...**
  34:14 35:1,22
  52:11
**recommended**
  33:3
**recommending**
  55:7
**record** 4:18
  10:12,15 11:24
  14:1 18:2 19:3
  20:14 22:24
  23:3,6,8 25:19
  26:9,14 28:5
  30:5 32:18
  41:18 43:20
  50:10 54:5,7,9
  54:22 61:3,20

**records** 10:5,11
  10:21,23 11:7
  18:13 20:7,20
  21:16,18 22:14
  25:20 27:12,14
  27:19 28:13,14
  29:11,14 30:5
  30:18,24 31:9
  31:19 32:22
  34:12 35:10,16
  36:10,13,18
  41:13 42:11
  55:16 58:10,12
  58:21
**reduced** 62:10
**refer** 60:5,6
**referral** 17:14
  33:15
**referred** 28:6
  29:9 35:8
**referring** 58:5
**reflect** 47:9
**regardless** 45:3
**regular** 56:2
**regurgitating**
  27:19
**related** 6:7
  10:11 11:15
  20:14 62:13
**relative** 62:16
**relied** 29:3,12
  40:14
**rely** 20:7 24:23
  28:5,15,18,21
  28:22,24

**relying** 44:14
**remain** 4:8
**repeat** 28:10
  49:23
**rephrase** 7:21
**report** 16:20
**reported** 31:20
  31:21 32:1
  34:13 47:4
  48:12
**reporter** 2:22
  4:9 7:8 54:3
  62:1,4
**reporting**
  51:20
**represent** 5:3
  10:9 46:15
**represented**
  45:7
**represents** 5:7
**requests** 9:6
**required** 43:17
  49:12 52:19
**research** 9:19
**residency**
  12:18 16:6,9
  16:10,12
**resolve** 51:9
**resolved** 57:1
**restate** 7:21
  27:11
**restrictions**
  55:16
**result** 17:3 47:8
  49:4

**retired** 29:23
  30:1
**return** 39:22
  55:13
**returned** 41:14
  55:3
**review** 20:6,15
  25:18,20 28:14
  28:18 29:14
  30:24 36:14
  38:6 39:18
  42:10 52:7
**reviewed** 11:7
  11:9 29:3,12
  30:7 36:13
**ride** 49:13
**riding** 47:15
  50:4 51:24
**right** 4:4 6:14
  8:22 9:18,22
  12:6 13:24
  14:4,16 15:6
  16:15,17,19
  19:11 20:22
  21:23 24:8,17
  25:6,13,21,23
  26:4 27:2
  28:23 29:6
  30:4,17 36:6
  38:13 39:16,24
  41:5,20 42:15
  43:1,1,19,24
  44:2,9 45:8
  46:2,4 47:6,12
  47:14 51:17,18

52:9 54:4,15
56:6,19,24
57:8,8,13 58:6
58:13,24 59:7
61:16,18,19
**room** 43:17
47:10
**rules** 1:14 5:19
6:15
**run** 18:11
**rundown** 12:14

**s**

**s** 2:12 3:1
**safety** 49:12
50:6
**saw** 23:24
26:22 30:11
34:3 38:13
42:23 44:11
**sayeth** 61:22
**saying** 14:1
15:9 26:3
**says** 15:21
25:21 40:4
42:13 43:3,4
43:21 55:20
**scaffolding**
55:18
**scan** 33:5 37:9
37:13,22
**school** 12:17
**screen** 46:18
54:3,13,15
58:19

**seated** 4:8
**second** 8:23
54:5
**see** 7:6 14:16
16:23 17:3,9
17:17 18:23
20:16 22:18
23:19 24:21
30:12 33:11,16
33:19,23 34:20
34:20,23 35:21
35:23,23 36:7
36:21,22,24
37:1,6,14,16
38:15 39:9,9
39:10 42:3
52:16 53:13
58:21
**seeing** 54:15
**seem** 41:17
**seemed** 33:9
34:16 40:24
**seen** 17:13 20:3
20:15 23:18
35:21 38:23
45:11
**seizures** 19:7
**send** 36:20
**sensation** 49:4
**sensitive** 49:12
**sensitivity**
50:18
**sent** 18:22 37:5
**sentence** 44:7

**separate** 15:16
**september**
29:17
**server** 21:10,11
**severe** 48:15
**shanta** 1:13 2:3
4:5,11,20 8:24
**share** 46:18
54:3,12
**sharing** 35:16
58:19
**short** 22:18
50:13
**shortly** 22:24
**shoulder** 7:12
**show** 61:14
**showing** 27:2
**shrugs** 7:12
**side** 47:16
49:13 50:4
51:24
**signature** 2:20
61:14,23 62:20
**signs** 50:15
**similar** 5:18
**similarly** 17:18
**sit** 21:23 22:3
27:13 45:24
**situation** 36:21
**sleeping** 32:4
50:14
**someone's**
57:23 59:1
**someplace**
35:15

**sorry** 12:10
18:14 24:18
27:1,4 29:7
38:24 47:20
52:4 53:9,21
54:18
**sort** 34:13
45:11
**sorts** 18:19
19:10
**sounds** 8:21
19:11 21:12
**southern** 1:2
**speak** 26:10
**speaking** 9:14
17:4 31:2
**speaks** 6:22
**specialty** 12:9
12:15 13:3
46:24
**specific** 23:13
48:21
**specifically**
4:24 22:6
32:10 48:23
**specifics** 19:2
**specify** 60:9,10
**speculation**
48:6 49:18
52:2 53:1
**spinning** 40:5
48:24,24 49:4
**st** 13:17,18 14:3
35:9 36:2

| | | | |
|---|---|---|---|
| **stamped** 10:16 | **suffer** 59:5 | 33:7 | **tfuller** 3:6 |
| **stand** 48:16 | **suffered** 47:12 | **taken** 1:16 23:4 | **thank** 11:7 |
| **standpoint** 20:17 | **suffering** 50:2 58:22 | 47:10 62:9,15 | 22:22 46:9 |
| **stands** 24:6 | **suite** 3:4 | **talk** 25:23 | 47:23 56:7,10 |
| **start** 4:3 31:6 | **sure** 7:16 12:13 | **talked** 22:5 | 59:16 60:23,24 |
| **started** 15:2 | 22:9 29:1 | 46:16 | 61:1,17,18 |
| **state** 1:18 4:18 | 32:12 42:8 | **talking** 50:22 | **therapy** 34:19 |
| 62:4 | 56:22 | **talks** 53:7 | 35:2,8,11 |
| **stated** 27:12 | **sustained** 42:1 | **tasks** 42:12 | **thereof** 40:11 |
| **statement** 31:10 | **swear** 4:9 | 50:3 | **thing** 39:13 |
| **statements** | **sworn** 4:10,12 | **teaching** 9:19 | 53:5 |
| 31:11 44:15,17 | 62:7 | **technical** 21:13 | **things** 19:10 |
| **states** 1:1 13:12 | **symptom** 48:23 | **telehealth** | 32:1 33:9 38:4 |
| **stenographic** | 56:18,23 | 34:21 36:11 | 38:10 61:8 |
| 62:9 | **symptoms** | **telemedicine** | **think** 6:15 8:17 |
| **stitches** 43:17 | 30:18 31:3,12 | 39:2 | 13:21,24 14:13 |
| 47:11 | 31:22 32:24 | **telephone** 39:6 | 15:2,8 16:1,3 |
| **stoop** 52:19 | 35:3 38:1 | **televideo** 34:5 | 18:8,11,18 |
| **stop** 47:11 | 39:19 40:10,23 | **tell** 6:20 8:7,13 | 22:11 26:16 |
| **street** 3:9 | 41:15 49:7 | 25:16 | 27:20 37:1 |
| **strength** 33:8 | 50:24 51:4,9 | **tend** 19:9 | 39:6 43:18,19 |
| **strike** 59:23 | 51:12 52:14,20 | **term** 19:4 | 46:5 47:8 |
| **stroke** 17:12,16 | 55:3,4 57:9,11 | 50:13 | 49:14 51:14 |
| 37:21 | 57:17 59:23 | **terminology** | 52:7 53:14 |
| **strokes** 17:15 | 60:5,7 | 48:20 | 55:23 58:14 |
| 19:8 | **syndrome** | **terms** 9:14 | **thomas** 3:3 5:6 |
| **subjective** | 57:20,22 58:23 | 16:19 19:19 | 22:17 46:14 |
| 31:14 | 59:3 60:1,2,4 | **testified** 4:13 | 47:21 58:15 |
| **subpoena** 9:2,6 | **system** 17:14 | 5:10 6:14 | **thought** 14:11 |
| 10:10 22:14 | | 27:18 47:9 | 15:10 19:14 |
| **subspecialty** | **t** | **testify** 4:21 9:2 | 37:17 |
| 12:8,15 13:3 | | 27:21 62:7 | **three** 9:23 51:3 |
| | **t** 2:12 | **testimony** 5:14 | 57:11 60:6 |
| | **take** 7:10 8:17 | 5:20 11:15,19 | **time** 4:3,6 6:22 |
| | 8:18 15:8 | 49:19 62:6,8 | 23:4,17 26:22 |
| | 20:10 22:18 | | |

| | | | |
|---|---|---|---|
| 30:10,15 31:24 32:6,7,23 33:4 33:15 34:3,15 34:21 38:4,23 40:2,20,23 41:12 42:13,17 43:11,21 45:20 46:22 52:12 55:1 56:9 57:10,17,18 59:16 61:24 | **treated** 20:3 44:19 46:23 56:4 **treating** 21:24 51:16 **treatment** 5:2 6:7 10:12 11:11,15,19 16:19,22 22:5 22:7 23:10,11 27:22 28:1,6 29:2,12,16,16 30:8 31:23 32:17 33:4 | **typically** 57:10 | **used** 17:11 |
| | | **u** | **v** |
| | | **u** 29:18 **uh** 9:5,8 19:21 46:21 48:17 53:17 54:14,21 **ultimately** 50:22 **unclear** 7:18 **under** 6:19 43:2 62:11 **undergoing** 14:24 **underscore** 10:16,17 **understand** | **various** 46:16 **verbally** 7:5,16 **version** 9:11 **versus** 19:20 59:22 **vertiginous** 32:2 **vertigo** 30:2 34:18 48:15,19 48:21 50:2 **vestibular** 48:21 |
| **tired** 32:2 50:12 **today** 4:22 5:4 5:8 7:15 8:10 10:19 11:24 21:23 27:13 45:24 | | | |
| | 38:4 42:11 55:22 **trial** 5:11 **trigger** 52:14 **triggered** 52:21 **true** 39:23 **truth** 6:20 62:7 62:8 | 11:6 13:24 15:22 17:10 21:3,21 26:2 26:19 29:1 32:14 46:19,22 48:12,19 **understanding** 15:18,23 45:5 | **video** 4:5 **videographer** 3:16 4:4 23:2,5 24:16 54:6,9 61:2,5,19 **videotaped** 1:12 **visit** 26:24 27:3 |
| **today's** 4:6 9:24 11:8,12 11:19 12:3 **told** 45:22 **took** 44:6 **train** 42:8 55:9 **trained** 16:6,6 **transcript** 61:8 **trauma** 57:12 **traumatic** 6:1,4 33:12 48:2 50:16,19,23 51:6 **treat** 14:9 18:15 48:12 59:10 | **try** 7:15 20:15 21:20 35:19 **trying** 20:17 26:2 **twelve** 3:4 **two** 5:1 9:1 60:14 61:8 **tylenol** 33:8 **type** 47:14,16 48:1 49:4 59:3 **types** 49:7,10 49:14 51:21 52:22 59:5 | 45:6 59:2 **understood** 8:2 **unfair** 27:22 **united** 1:1 **university** 12:18,19,22 **unresolved** 59:8 **ups** 56:12 **use** 21:2 | 34:5,8,22 36:11,17 52:8 53:7,24 58:20 **visits** 26:21 **vs** 1:6 |
| | | | **w** |
| | | | **wait** 6:22 7:1 8:6 61:4,4,4 **waive** 61:9,10 61:13 **waived** 2:20 61:14,23 |

**want** 5:20
27:24 32:15,16
34:23 47:21
56:19
**wanted** 33:5,10
34:18 35:24
37:1 52:7
**way** 5:18 7:20
7:22 28:3 34:1
38:21 41:3
43:5
**we've** 7:20 9:22
**weeks** 51:10
60:14
**went** 11:24
23:8 30:19
36:22,24 38:14
43:16
**whooziness**
30:16
**window** 57:17
60:6,7
**wisconsin**
12:19 13:7
**witness** 2:3,20
4:10,22 22:22
24:18 27:20
28:10 38:10
40:19,23 48:9
49:19,22 50:8
52:3,5 53:3
56:10 59:14,17
60:21,24 61:10
61:13,16,18
62:5,9

**word** 51:5
**words** 32:15
52:18
**work** 12:8,14
14:8 17:20
18:16 19:22,23
29:21 52:20
55:2,13
**worked** 14:16
**working** 22:20
23:1 32:6,6,7
46:19
**works** 9:14
18:10
**worse** 37:12
40:24
**worsening**
52:14
**write** 26:13,14
43:11,14,15
44:23 45:23
**written** 23:22
42:7 57:24
58:12 59:1
**wrong** 54:19
57:3
**wrote** 26:10
31:5

**x**

**x** 2:1,12

**y**

**yeah** 7:13 15:2
21:7 22:17
24:15,18 36:3

43:15 47:7
50:1 53:11,18
53:20
**year** 12:20
**years** 15:2
**yep** 13:1 41:7,7
53:12

**z**

**zoom** 1:12 3:6
3:11,14 4:5 5:6
7:19

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.